**In re PRANGE FOODS,
CORPORATION,
Debtor.**

**ST. JOSEPH BANK AND TRUST
COMPANY, d/b/a Capital Credit
Company, Plaintiff,**

**v.**

**DeBRUYN PRODUCE CO., et
al., Defendants.**

**Bankruptcy No. HK 84 02483.
No. K 85 137 CA.
Adv. No. 85 0132.**

United States Bankruptcy Court,
W.D. Michigan.

May 8, 1986.

Bruce R. Grubb, Stephen M. Denenfeld, Deming, Hughey, Lewis, Keiser Allen & Chapman, Kalamazoo, Mich., for plaintiff.

Thomas P. Sarb, Susan Wilson Keener, Miller, Johnson, Snell & Cummiskey, Grand Rapids, Mich., for De Bruyn Produce.

Robert L. Hencken, Seyburn & Hencken, Kalamazoo, Mich., for Central Michigan Packing.

Charles F. Scofield, Niles, Mich., for S & S Farms.

Philip T. Carter, James B. Croom, Foster, Swift, Collins & Coey, Lansing, Mich., for Michigan Agricultural Coop. Marketing Ass'n Dwan's Fruit Farm and Vern Hauch.

Rodger Bittner, Globensky, Gleiss, Henderson & Bittner, St. Joseph, Mich., for Southern Michigan Cold Storage Co.

Horace Adams, Adams Law Offices, P.C., Paw Paw, Mich., for Paw Paw Freezers and Lawrence Freezers.

Jeffrey K. Helder, Dalman, Murphy, Bidol and Bouwens, P.C., Holland, Mich., for Michigan Celery Promotion Coop.

David Davidoff, Stanley, Davidoff & Gray, Kalamazoo, Mich., for Richard Remes, trustee.

## REPORT OF SPECIAL MASTER REGARDING VARIOUS MOTIONS FOR SUMMARY JUDGMENT PACA TRUST FUND CLAIMS IN BANKRUPTCY

LAURENCE E. HOWARD, Bankruptcy Judge.

This report concerns the motions for summary judgment filed by the plaintiff, St. Joseph Bank and Trust Company ("Bank"), and by defendants S & S Farms, Inc., DeBruyn Produce Company, Central

Michigan Packing, and the Michigan Agricultural Cooperative Marketing Association ("MACMA") on behalf of its members and others.

The debtor, Prange Foods, was a dealer in fresh vegetables. The plaintiff Bank was the debtor's secured lender. The defendants originally were various warehousemen and growers who were creditors of the debtor. The Bank began this adversary proceeding in order to establish the superiority of its security interest in the debtor's assets over the warehousemen's liens and the trust fund claims asserted by the growers under the Perishable Agricultural Commodities Act (PACA), 7 U.S.C. § 499a, *et seq.*, as amended in 1984. Only PACA claimants remain. Reference of the adversary proceeding was withdrawn pursuant to 28 U.S.C. § 157(d) because of the PACA claims. The District Court then appointed this Court special master in the case.

At the pretrial conference, the parties stipulated to the following facts. The Bank entered into a revolving loan agreement with the debtor on August 25, 1983. On the same day the debtor granted the Bank a security interest in and to all its present and after acquired inventory, and proceeds and products of the inventory wherever located. The Bank perfected this security agreement with appropriate filings in September, 1983.

On May 7, 1984, President Ronald Reagan signed an amendment to PACA giving trust fund status to certain obligations of produce purchasers to produce growers.[1] Simply put, an obligation from a produce dealer to a produce grower that is not timely paid becomes a trust obligation of the dealer, prior to and superior to any lien or security interest in inventory held by the dealer's secured lender. In order to qualify, the grower must file a notice of his claim of trust protection with the dealer and the Secretary of Agriculture within 30 days after the payment was due. At all times relevant the debtor was a commission merchant, dealer or broker under PACA, and the defendant claimants were suppliers or sellers under PACA. The produce purchased by the debtor constituted perishable agricultural commodities and the transactions were in interstate commerce, as defined by PACA. The PACA trust is a nonsegregated floating trust which covers all of the dealer's inventory, product and proceeds; the PACA claimants need not trace the proceeds of their produce. The Bank's entire claim of about $969,990.57 plus interest was lent to the debtor after May 7, 1984. During the 1984 growing and

---

1. The following two sections, 7 U.S.C. § 499e(c)(2) and (3), are the heart of the amendment:

(2) Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents. Payment shall not be considered to have been made if the supplier, seller, or agent receives a payment instrument which is dishonored. The provisions of this subsection shall not apply to transactions between a cooperative association (as defined in section 1141j(a) of Title 12), and its members.

(3) The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker and has filed such notice with the Secretary within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary, (ii) after expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction, or (iii) after the time the supplier, seller, or agent has received notice that the payment instrument promptly presented for payment has been dishonored. When the parties expressly agree to a payment time period different from that established by the Secretary, a copy of any such agreement shall be filed in the records of each party to the transaction and the terms of payment shall be disclosed on invoices, accountings, and other documents relating to the transaction.

harvesting season, the debtor contracted with many farmers for delivery of various kinds of produce, with differing terms for payment. The PACA claims cover only 1984 crops; no amounts due growers for the sale of 1983 crops are eligible for trust protection under PACA.

On October 24, 1984, Prange filed its voluntary petition under Chapter 11 of the Bankruptcy Code. After the conversion of the case to Chapter 7, the debtor's inventory was liquidated and the proceeds escrowed. As of December 31, 1985, the total balance in the escrow account was $695,942.50.

■ As noted above, the debtor dealt with many growers during 1984. Rather than recount each set of facts, the Court will endeavor to identify and answer the common dispositive legal questions. Further stipulations of fact will be referred to where relevant.

I. Whether the 1984 Amendments to the Perishable Agricultural Commodities Act became effective on May 7, 1984, when signed by President Reagan, or on December 20, 1984, when the regulations became effective.

The court believes the question has been answered by the opinion in *In re Fresh Approach Inc.*, 48 B.R. 926 (Bankr.N.D. Tex.1985). The *Fresh Approach* court devotes pages 928 through 930 to a very full discussion of this issue, and concludes that the PACA trust fund amendment was effective as of May 7, 1984. For all the reasons given in *Fresh Approach*, this court concurs.

II. Whether the Regulations which became effective December 20, 1984, apply in whole or in part to growers who delivered product before the Regulations took effect?

■ According to 7 C.F.R. § 46.46(a) the regulations promulgated pursuant to the PACA trust fund amendment "cover all

transactions existing as of and entered into on or after the effective date of these regulations." The *Fresh Approach* court read this language as making the regulations retroactive, and so applied them to preserve a grower's trust fund claim. 48 Bankr. 930–931. This court agrees. Therefore, if, as of December 20, 1984, a dealer had outstanding obligations to growers those obligations are governed not only by the PACA trust amendment but also by its implementing regulations.

III. Whether those Defendants having contracts calling for payment more than 30 days from the date of delivery qualify for coverage under PACA?

■ As noted above, the regulations effective December 20, 1984, apply to transactions outstanding as of that date and henceforth. Those regulations provide at 7 CFR § 46.46(f)(2) that full payment for produce must be due within 30 days of delivery in order for a grower to qualify for PACA trust protection. The defendants here however, contracting months before the publication of the regulations, agreed to a variety of payment terms that in many situations required payment more than 30 days after delivery of the produce.

Although the regulations by their terms are to be applied retroactively, the court believes it would be inequitable and irrational to so apply them on this issue. At the time these parties contracted with the debtor, they had only the bare words of the statute to guide them. Those few words would appear to give them two alternative routes to PACA trust protection: either file a notice within 30 days after a cutoff date yet to be set by the Secretary of Agriculture, or within 30 days after a cutoff date agreed to in writing by the parties.[2] 7 U.S.C. § 499e(c)(3)(i) and (ii). Obviously, the first alternative was illusory, because the Secretary did not publish the regulations until long after the crops were harvested and delivered. Therefore, the only

---

**2.** A third alternative, within 30 days after the dishonor of a check proffered in payment, is inapplicable here.

choice the growers had was to rely upon the plain words of the statute. It would be irrational to penalize them for this by insisting upon compliance with regulations published months later. No one can be expected to engage in rational economic decision making if they have to play by rules they will not be told about until after the game is over.[3]

Therefore, defendants who have written contracts calling for payment more than 30 days from the date of delivery will not by reason of those terms alone be barred from obtaining PACA coverage.

IV. Whether PACA protects growers who entered into an express oral, but not written, agreement with the debtor extending payment terms from within 10 days after delivery or acceptance to thirty days after delivery.

■ As noted above, PACA covers three alternative situations with different notice deadlines for each. Section (3)(i) provides that notice must be filed within 30 days "after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary." Section (3)(ii) provides that notice must be filed within 30 days "after expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction." (Section (3)(iii) is again here inapplicable.) Under the regulations issued by the Secretary, payment is due within 10 days after delivery, unless the parties have by written agreement extended the time for payment up to 30 days after delivery. 7 CFR §§ 46.2(aa), 46.46(f). Extensions greater than 30 days do not qualify for PACA trust protection under these regulations.

One defendant, however, DeBruyn Produce, had an oral agreement to extend the time for payment to thirty days. DeBruyn points out that under the pre-trust fund amendment regulations in effect on May 7, 1984, payment was also due within

10 days, but that could be altered by oral agreement of the parties. DeBruyn therefore argues that its oral agreement should be upheld under the old regulations, and then allowed to qualify for PACA trust fund protection, presumably under § (3)(i). In short, the PACA trust fund amendment would allow the claimant on an oral contract ten days for payment and 30 days to give notice, resulting in a deadline 40 days after delivery. DeBruyn seeks to obtain a 60 day deadline for filing its notice, despite the fact that it has only an oral contract.

However, the explicit words of § (3)(ii) cannot be circumvented by appeal to the old regulations. The PACA trust fund provisions were new, and clearly § (3)(i) could refer only to new regulations yet to be released as of May, 1984. As the *Fresh Approach* court noted, § (3)(i) was unavailable until the Secretary issued regulations implementing it, and § (3)(ii) is unavailable to those who do not have a written pre-transaction contract. 48 Bankr. 930. The regulations are retroactive and require payment on oral contracts to have been due within 10 days. Even were this court to decline to apply the regulations retroactively, that would be to no avail to DeBruyn. The court so declined in Section III because to retroactively apply the regulations would be to prejudice those who relied upon the plain words of the statute. But here DeBruyn does not rely upon the plain words of the statute but rather seeks to evade them. The only claimants on oral contracts that Congress has chosen to protect are those to whom payment was due within ten days after delivery.

V. Whether the date of "receipt and acceptance" of produce may be understood as referring to either the shipment date or the invoice date.

■ A question has arisen as to whether the shipment date or the invoice date may be considered the date of "receipt and acceptance" of produce for the computation of the deadlines. The regulations provide

---

**3.** Given this result the Court need not address the defendants' argument that the regulations violate the statutory language; were the Court

to consider that question, however, it would be inclined to hold the regulations are within the language and intent of the statute.

that "receipt and acceptance" are defined at 7 CFR § 46.2(dd) and 7 CFR § 46.-46(b)(1). See 7 CFR § 46.46(f)(2). Section 46.2(dd) defines "acceptance" as

(1) Any act by the consignee signifying acceptance of the shipment, including diversion or unloading;

(2) Any act by the consignee which is inconsistent with the consignor's ownership ...

Section 46.46(b)(i) defines "received" as "the time when the buyer, receiver or agent gains ownership, control or possession of the perishable agricultural commodities." These regulations obviously are not referring to either the shipment date, nor the invoice date, but to the delivery date.

VI. Whether the filing of the debtor's petition in bankruptcy operated to stay or excuse the defendants from filing their notices of intent to preserve benefits within 30 days after payment was due as required by PACA.

■ The PACA language emphatically requires the filing of notices of intent to preserve benefits. In order to qualify for those benefits, the statute requires that the notice be filed within 30 days after payment was due. The statute gives no exceptions.

The ultimate question is whether the automatic stay of 11 U.S.C. § 362 stays or excuses that filing within 30 days if a bankruptcy petition intervenes. However, the threshold question is whether § 362 also stays the running of the 30 day period.

There are no cases directly on point under PACA, but the courts of this circuit are very familiar with the question of whether the filing of a bankruptcy petition tolls the running of a statutory period against the debtor. In *In re Wallace*, 33 B.R. 29 (Bankr.W.D.Mich.1983), Judge Nims of this district held that the filing of a Chapter 13 plan would stay any act by a mortgagee to recover possession of property once the statutory redemption period that follows a foreclosure sale had elapsed. However, he also held that it would stay only such acts; it would not stay the running of the re-demption period itself. 33 B.R. at 32. The Sixth Circuit endorsed *Wallace* in *In re Glenn*, 760 F.2d 1428 (6th Cir.1985), which held that "the filing of a petition in bankruptcy did not toll or extend the running of a statutory period of redemption." 760 F.2d 1440. If the filing of a petition in bankruptcy does not toll or extend the running of a statutory period of redemption against the debtor, it cannot stay, toll, or extend the statutory period for filing of a PACA notice running against a creditor of the debtor. Therefore, the automatic stay cannot toll or excuse the filing requirement.

The next question is whether § 362 stays a claimant from filing a notice while his time is running, thereby requiring a claimant to file for a lift of stay in order to file the PACA notice. Section 362(b)(3) provides that the automatic stay does not stay any act to perfect an interest in property if that interest will prevail over a trustee under § 546(b). The legislative history explains that, "If the act of perfection, such as filing, were stayed, [Section 546(b)] would be nullified." House Report No. 595, 95th Cong., 1st Sess. 343 *reprinted in* 1978 U.S.CODE CONG. & AD.NEWS 5787, 5963, 6299. Section 546(b) provides that the rights and powers of a trustee are subject to "any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection." The legislative history of this section explains that "if an interest holder against whom the trustee would have rights still has, under applicable nonbankruptcy law, and as of the date of the petition, the opportunity to perfect his lien against an intervening interest holder, then he may perfect his interest against the trustee." House Report No. 595, 95th Cong., 1st Sess. 371; *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 5963, 6327. Although the legislative history suggests that § 546(b) was primarily aimed at accommodating certain provisions of the Uniform Commercial Code, the statute itself does not limit the term "applicable nonbankruptcy law" in

any way, so PACA could also qualify. Prior to the filing of notice the claimant has a debt owed; filing of the PACA notice "perfects" that interest by giving the claimant a trust claim. That claim relates back to defeat any other intervening claimant, such as a trustee in bankruptcy or a secured creditor.

■ The automatic stay does not toll the thirty day period for filing, nor does it excuse a PACA claimant from filing within that period. A PACA claimant, however, need not obtain a lift of stay before filing his PACA notice.[4]

VII. Whether notice of intent to preserve PACA benefits had to comply with the requirements set forth by the Secretary of Agriculture in the regulations.

■ The regulations promulgated by the Secretary of Agriculture on November 20, 1984, are retroactive. Those regulations require a notice to include the names and addresses of all parties involved, the date of the transaction, a description of the commodity involved, the contract terms, the invoice, the price, the date payment was due, the date notice of dishonor of a check was received if applicable, and the amount past due and unpaid. 7 CFR § 46.46(g)(3). The question has arisen as to whether notices filed before the December 20, 1984, effective date of the regulations had to comply with these requirements.

Strictly speaking the answer would be yes. However, although PACA trust fund protection was available since May 7, 1984, no one could possibly know what a notice must contain until the regulations were published on November 20 of that year. The court believes it would be unjust and irrational to deprive claimants of PACA protection for failing to comply with regulations they had no way to follow. There-

fore, if any notices were filed before November 20, 1984, they will be sufficient if they identify the claimant individually and generally establish the nature of his claim. Conversely, anyone who filed a notice after November 20, 1984, had notice of the Secretary's requirements and of the retroactive nature of those requirements. Therefore, any notice filed after November 20, 1984, must comply exactly with the Secretary's regulations.

The court would note that the MACMA notice dated December 3, 1984, would not meet these standards. The notice does not identify the individual claimants, nor does it describe their claims with any particularity.

VIII. Whether amended notices filed to supplement earlier incomplete notices would relate back to the filing date of the incomplete notice.

The Regulations provide at 7 CFR § 46.46(g)(3) that an appropriate notice of intent to preserve benefits must supply the information indicated above in Section VII of this opinion. The Regulations make no provisions for amended or supplementary notices. However, in Section VII this court created an exception for claimants who filed before November 20, 1984, and held that such notices need not comply with all the requirements of the regulations. Claimants who fall into this category need not worry; the court has held their notices sufficient without reference to any later, supplementary notices.

However, if a notice was filed after November 20, 1984, and it did not comply with the regulations, it may not be buttressed or supplemented by a later notice. Unless a claimant falls into the exception for pre-November 20, 1984 notices, the filing date for that claimant's notice will be the day the claimant's first complete notice was filed.

---

**4.** Although the entire legislative history of the PACA trust amendment shows it was aimed specifically at the situation where a dealer filed for bankruptcy, nowhere in the amendment or the legislative history does Congress consider the impact, if any, of the automatic stay upon the filing requirement. As Congress must be presumed to know the law, if Congress did not mention any such impact, it may be because

To consider an example, the MACMA[5] notice dated December 3, 1984, did not identify any claimant by name, nor the amount of the debts due them. Therefore, it was insufficient and null. The MACMA notice mailed January 10, 1985, (Plaintiff's Exhibit 13; see also Pretrial Order, page 10) would not relate back to December but would instead have a filing date in January. Therefore, all claimants listed in the January, 1985, notice have a January filing date, apparently January 18, 1985. (Pretrial Order, page 10). Further, if a notice introduced a new claimant, as MACMA's third and fourth notices did, (Plaintiff's Exhibit 14, dated February 28, 1985, and Plaintiff's Exhibit 15, dated June 27, 1985) that claimant's filing date would be the filing date of the first conforming notice which mentioned him. Therefore, claimants introduced in the third MACMA notice would have a filing date of March 4, 1985, and those introduced in the fourth notice would have a filing date of July 5, 1985. (Pretrial Order, page 10).

■ The court has made a slight exception for those who had to act before the Regulations were published in order to preserve their PACA benefits. However, as a general rule, the Regulations must be followed. Therefore, a nonconforming notice may not be supplemented by a late notice that conforms with the Regulations in its content. Congress has set a thirty day deadline for the filing of PACA notices. It has not made any provision allowing for amended or supplemental notices. To allow a claimant to for file a totally insufficient notice prior to the deadline and then file a tardy but complete supplementary notice would be to erase the deadline Congress has set.

IX. Whether "filing" of a notice to preserve PACA trust benefits occurs upon mailing of the notice by the unpaid seller or upon receipt by the Secretary of Agriculture.

■ The regulations provide that a timely filing of a notice of intent to preserve PACA trust benefits will be considered to have been made if a written notice is "filed with the Secretary *by delivery at* the headquarters office or a regional office of the PACA Branch of the Fruit and Vegetable Division, Agricultural Marketing Service, within 30 calendar days after default as described above." 7 CFR § 46.-46(g)(2). (emphasis added). The regulations clearly state that "filing" occurs upon delivery to and receipt by the Secretary of Agriculture, not upon mailing. Delivery is also the rule under the Packers and Stockyards Act, 7 U.S.C. § 181, *et seq.*, upon which PACA is patterned. *Hedrick v. S. Bonaccurso and Sons, Inc.* 466 F.Supp. 1025, 1032 (E.D.Pa.1978). Therefore, "filing" occurs not upon the mailing of a notice but upon its receipt by the Secretary.

X. Whether MACMA growers who delivered peppers to the debtor after receiving the Salverson pricing letter or after seeing the posted price terms had payment terms "expressly agreed to in writing" within the meaning of 7 U.S.C. § 499c(e)(3)(ii).

■ Section (3)(ii) provides that in order to preserve his PACA trust benefits an unpaid grower must file a notice of intent to preserve those benefits within thirty calendar days after, *inter alia*, whatever date the parties themselves have set for payment "as the parties have expressly agreed to in writing before entering into the transaction." [6]

Certain pepper growers sold the debtor peppers based on a letter signed by Jack

Congress did not see the automatic stay as hindering a claimant from filing a PACA notice.

**5.** MACMA is a trade organization which has no claim of its own against the debtor, but which represents various growers who do hold such claims. In that capacity it filed four notices between December, 1984, and June, 1985, on behalf of certain of its members. Since the

claims belong to the individual members, not to MACMA, each claim is independent, with its own filing date, and no claimant can rely upon another to establish his claim.

**6.** The regulations limit their choices to any date up to a maximum of thirty days of delivery of the produce. 7 CFR § 46.46(f)(2).

**220**

Salverson, the debtor's Field Representative. The growers contend that this letter fits the requirements of § (3)(ii).

Jack Salverson sent letters to all growers who had previously sold peppers to Prange detailing the debtor's quotas, rates and payment terms, which exceeded thirty days. Prange also posted this letter at its delivery dock. Growers delivered peppers to Prange and signed a weight ticket on delivery. Prange would then process the peppers and credit the grower based on the type of pepper and the plant recovery percentage. (Pretrial Statement, Stipulation of Fact (p), page 8). The growers argue that the letter and weight tickets taken together constitute written contracts.

The Salverson letter is a unilateral offer seeking acceptance by performance. The terms are certainly written down, the parties did have a contract, and it was a written contract of sorts. However, § (3)(ii) requires a contract "expressly agreed to in writing before entering the transaction." The pepper growers did not accept this offer in writing, but by performance. Delivering peppers constituted acceptance, not signing the weight ticket, and the weight ticket was signed after delivery of the peppers, not before the transaction. Although the pepper growers who delivered peppers in reliance on the Salverson letter had contracts with the debtor, they are not contracts "expressly agreed to in writing before entering into the transaction" and therefore they are outside the ambit of § (3)(ii).

XI. Whether the claims of certain growers who agreed to purchase stock of the debtor should be reduced by the amount of their subscription as a set-off.

Two growers, DeBruyn Produce and Carl Tidey, entered into stock subscription agreements with the debtor in 1983. Both growers paid the debtor $5,000 in 1983, and were to pay the balance due by way of credits on the sums the debtor would owe them on the 1983 and 1984 crop. For De-Bruyn, the balance due was $30,000, and was to be paid by equal credits of $15,000 each on the 1983 and 1984 crop. However, DeBruyn in fact gave the debtor a credit for the entire $30,000 on the 1983 crop. Nonetheless, the plaintiff seeks to reduce DeBruyn's PACA claim for the 1984 crop by $15,000 as per the original agreement. The court can see no grounds for this, as both counsel have agreed in Court that De Bruyn's subscription balance has been completely paid. (Transcript of Hearing of January 31, 1986, at page 9). Therefore, DeBruyn's 1984 PACA claim cannot be reduced as there is no balance due.

■ As to Carl Tidey, the court must deny summary judgment as to whether or not he owes the debtor any amount on his stock subscription and whether it may be set off. Mr. Tidey's counsel has raised certain objections to the sufficiency of the pleadings, but that is not the reason for denial. Deficiencies, if any, in the pleadings could easily be remedied by amendments. The fundamental reason for denial is that, unlike the De Bruyn stock subscription, there is no agreement as to what is or is not owed. This issue raises a genuine issue of fact which the court cannot answer from this record. Therefore, summary judgment either for or against Mr. Tidey is precluded on this issue, although of course the court's other recommendations may render this question moot by permitting summary judgment against Mr. Tidey on other grounds.

## CONCLUSION

The court has tried to pierce the confusing multiplicity of facts by identifying and answering the pivotal legal questions.[7] Generally, it has held that the PACA trust fund amendment was effective upon enactment on May 7, 1984. Further the Regulations are valid and should be enforced, with certain slight transitional exceptions that

---

**7.** One legal issue the Court did not think pivotal was the constitutionality of the PACA trust fund provisions. The Bank had argued that a retroactive application of PACA would violate the Fifth Amendment to the United States Constitution. However, counsel for the Bank has conceded that as all the Bank's debt accrued after May 7, 1984, and that no claims for the 1983 crop qualify for PACA trust protection (Pretrial Statement, page 15, points 7(yy) and 7(bbb)), a

 

do not contradict the statute, allowed for those who sought PACA trust fund protection during the gap period between enactment and issuance of the regulations. However, the Court will confess that it cannot alone apply these principles to the diverse fact situations presented. Therefore, the court asks that Mr. Bruce Grubb, in consultation with the other attorneys, draft a recommendation which applies the rulings of this report to each defendant. The court will then schedule a hearing on the proposed recommendation at which time any party may object to the recommendation if they do not believe it conforms to the report. Also, if the parties believe the court has failed to answer a legal question necessary to the resolution of the case as to any defendant,[8] they may so inform the court at this hearing. After that hearing, the court will present the report and recommendation to Judge Enslen.

---

ruling by this Court that the PACA amendment was effective May 7, 1984, would avoid any constitutional problem. (Transcript, Hearing of January 31, 1986, page 8). Given this concession, and the Court's recommendation to so held, this Court refrained from notifying the Attorney General of the United States as provided for at 28 U.S.C. § 2403(a).

8. The Court is aware that certain factual questions remain as to two defendants, Richard Smith and Greg Tidey (see Pretrial Statement, points 8(a) & (b), page 16–17), but these may not preclude summary judgment as to them depending upon the cumulative effect of the principles stated in the report. See Transcript Hearing of January 31, 1986, at page 6.