

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-1-2000

# In Re: Magic Rest

Precedential or Non-Precedential:

Docket 99-5113

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation
"In Re: Magic Rest" (2000). *2000 Decisions*. Paper 42.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/42

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 1, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5113

IN RE: MAGIC RESTAURANTS, INC.;
MAGIC AMERICAN CAFE, INC.,

      Debtors

MAGIC RESTAURANTS, INC.;
MAGIC AMERICAN CAFE, INC.

v.

BOWIE PRODUCE CO., INC.,

      Appellant

PATRICIA A. STAIANO,

      Trustee.

On Appeal From the United States District Court
For the District of Delaware
(D.C. Civ. No. 97-300-JJF)
District Judge: Honorable Joseph J. Farnan, Jr.

Argued: December 8, 1999

Before: NYGAARD, RENDELL and ROSENN,
Circuit Judges.

(Filed: March 1, 2000)

      Stephen P. McCarron, Esquire
       (Argued)
      McCarron & Associates
      4910 Massachusetts Avenue, N.W.,
       Suite 18
      Washington, DC 20016

      Mark Minuti, Esquire
      Saul, Ewing, Remick & Saul
      222 Delaware Avenue, Suite 1200
      Wilmington, DE 19899

       Counsel for Bowie Produce
      Co., Inc.

Brendan Linehan Shannon, Esquire
 (Argued)
Laura Davis Jones, Esquire
Young Conaway Stargatt &
 Taylor, LLP
Rodney Square North, 11th Floor
Wilmington, DE 79899-0391

John A. Lee, Esquire
Andrews & Kurth, L.L.P.
4200 Chase Tower
Houston, TX 77002

 Counsel for Magic Restaurants,
Inc. and Magic American Cafe,
Inc.

OPINION ANNOUNCING THE JUDGMENT
OF THE COURT

ROSENN, Circuit Judge.

The sole question presented by this appeal is whether restaurants are "dealers" under the Perishable Agricultural Commodities Act, 7 U.S.C. S 499a et seq. ("PACA"), and therefore subject to its trust provision, 7 U.S.C.S 499e(c). The United States Bankruptcy Court for the District of Delaware held that they are, and subsequently granted partial summary judgment in favor of the Appellant. The United States District Court reversed. We hold that restaurants are dealers under the plain language of PACA, and we therefore reverse the order of the district court and reinstate the order of the bankruptcy court.

2

I.

On April 6, 1995, Magic Restaurants, Inc. and Magic American Cafe, Inc. (collectively "Magic")filed voluntary bankruptcy petitions in the bankruptcy court for reorganization under Chapter 11 of the Bankruptcy Code. Magic, directly or through its subsidiaries, owned and operated fifteen restaurants in the Washington, D.C. and New York City metropolitan areas. These restaurants generated $20 million in sales revenues in a six month period in 1995-96. Magic purchased fresh fruits and vegetables from Bowie Produce Co., Inc. ("Bowie"), which it processed into food items, including salads or hamburger trimmings, and sold to its restaurant customers. At the time Magic filed for bankruptcy in April 1995, it owed Bowie $98,983.74 for these produce purchases.

Bowie commenced an adversarial proceeding in the bankruptcy court to recover full payment from Magic on the ground that the proceeds from the produce Magic had purchased were trust funds under Section 5(c) of PACA, 7 U.S.C. S 499e(c). Magic moved for summary judgment on the ground that as a restaurant, it was not a "dealer," and was therefore not subject to PACA's trust provision. By memorandum opinion and order dated June 18, 1996, the bankruptcy court denied Magic's motion and held that Magic was a "dealer" under the plain language of PACA. On January 15, 1997, the bankruptcy court granted partial summary judgment for Bowie, awarding it $93,173.29 in trust proceeds.

Magic appealed the bankruptcy court's ruling to the district court pursuant to 28 U.S.C. S 158(a). The district court reversed the bankruptcy court by memorandum opinion and order dated January 6, 1999, holding that Magic was not a "dealer" under PACA and therefore was not subject to its trust provision. This timely appeal followed.

II.

A. Statutory Background.

Congress enacted PACA in 1930 "to promote fair trading practices in the marketing of perishable agricultural

3

commodities, largely fruits and vegetables." Consumers Produce Co., Inc. v. Volante Wholesale Produce, Inc. , 16 F.3d 1374, 1377-78 (3d Cir. 1994). PACA was " `designed primarily for the protection of the producers of perishable agricultural products -- most of whom must entrust their products to a buyer or commission merchant who may be thousands of miles away, and depend for their payment upon his business acumen and fair dealing.' " In re Kornblum & Co., Inc., 81 F.3d 280, 283 (2d Cir. 1996) (quoting H.R. Rep. No. 1196, at 2 (1955), reprinted in 1956 U.S.C.C.A.N. 3699, 3701). Producers of perishable agricultural goods are in large part dependent upon the honesty and scrupulousness of the purchaser or consignee who geographically may be far removed. To provide producers with some protection, Congress fortified the original PACA with two primary weapons. First, it prohibited certain conduct by "commission merchants," "brokers," or "dealers." 7 U.S.C. S 499b. Failure to abide by these prohibitions rendered the "commission merchant, dealer, or broker . . . liable to the person or persons injured thereby for the full amount of damages . . . sustained in

consequence of such violation." Id. SS 499e(a) & 499e(b). Second, PACA established a mandatory licensing scheme, under the supervision of the Secretary of Agriculture, for any "person" carrying on "the business of a commission merchant, dealer, or broker." Id. S 499c. The Secretary was given the power to refuse, suspend, or terminate licenses on numerous grounds, including conduct prohibited under S 499b. See 7 U.S.C. SS 499c, 499d, 499h. Any person doing business without the required license was subject to monetary penalties. Id. S 499c(a).

PACA in its original form therefore protected produce growers and producers, and worked to make "the marketing of perishable agricultural commodities more orderly and efficient." Hull Co. v. Hauser's Foods, Inc., 924 F.2d 777, 779 (8th Cir. 1991). Even with the passage of a half-century after its initial enactment, Congress, in 1984, determined that prevalent financing practices in the perishable agricultural commodities industry were placing the industry as a whole, including produce sellers, in jeopardy. It responded by amending PACA, explaining:

4

It is hereby found that a burden on commerce in perishable agricultural commodities is caused by financing arrangements under which commission

merchants, dealers, or brokers, who have not made payment for perishable agricultural commodities purchased, contracted to be purchased, or otherwise handled by them on behalf of another person, encumber or give lenders a security interest in, such commodities, or on inventories of food or other products derived from such commodities, and any receivables or proceeds from the sale of such commodities or products, and that such arrangements are contrary to the public interest. . . .

7 U.S.C. S 499e(c)(1).1

In order to "remedy such burden on commerce in perishable agricultural commodities and to protect the public interest," id., Congress "increase[d] the legal protection for unpaid sellers and suppliers of perishable agricultural commodities until full payment of sums due

_____

1. The legislative history of the 1984 PACA amendments further explains the problem Congress intended to address:

Sellers of agricultural commodities are often located thousands of miles from their customers. Sales transactions must be made

quickly or they are not made at all . . . . Under such conditions, it
is often difficult to make credit checks, conditional sales agreements, and take other traditional safeguards.

* * *

Many [buyers], in the ordinary course of their business transactions, operate on bank loans secured by [their] inventories, proceeds or assigned receivables from sales of perishable agricultural commodities, giving the lender a secured position in the
case of insolvency. Under present law, sellers of fresh fruits and vegetables are unsecured creditors and receive little protection in any suit for recovery of damages where a buyer has failed to make payment as required by the contract.

In recent years, produce sellers have been subjected to increased instances of buyers failure to pay and slow payments.

H.R. Rep. No. 98-543, at 3 (1983), reprinted in 1984 U.S.C.C.A.N. 405, 406.

have been received by them," H.R. Rep. No. 98-543, at 3 (1983), reprinted in 1984 U.S.C.C.A.N. 405, 406 (emphasis added), by enacting 7 U.S.C. S 499e(c). This provision imposes a floating, non-segregated trust on produce buyers for the benefit of unpaid produce suppliers.2 The corpus of this trust is comprised of (1) the perishable agricultural commodities purchased from these suppliers, (2) all inventories of food or other products derived from the perishable agricultural commodities, and (3) receivables or proceeds from the sale of such commodities or products. 7 U.S.C. S 499e(c)(2). The statutory trustee is the delinquent "commission merchant, dealer, or broker." Id. The unpaid supplier loses the benefits of the trust unless written notice of intent to preserve the trust is given to the trustee within thirty calendar days after payment must be made. Id. S 499e(c)(3). In essence, PACA's trust provision gives the unpaid supplier an interest in the trust corpus superior to the interest of any other lien or secured creditor. See Consumers Produce, 16 F.3d at 1379; In re W.L. Bradley Co., Inc., 75 B.R. 505, 509 (Bankr. E.D. Pa. 1987) (quoting In re Prange Foods, Corp., 63 B.R. 211, 214 (Bankr. W.D. Mich. 1986)).

B. The District Court's Decision.

Bowie's appeal hinges on its contention that Magic is a "dealer" under PACA.3 If Bowie is correct, it has priority to
_____

2. The trust provision states, in relevant part:

> Perishable agricultural commodities received by a commission
> merchant, dealer, or broker in all transactions, and all
inventories

> of food or other products derived from perishable agricultural
> commodities, and any receivables or proceeds from the sale of such
> commodities or products, shall be held by such commission
> merchant, dealer, or broker in trust for the benefit of all unpaid
> suppliers or sellers of such commodities or agents involved in the
> transaction, until full payment of the sums owing in connection
with

> such transactions has been received by such unpaid suppliers,
> sellers, or agents. . . .

7 U.S.C. S 499e(c)(2).

3. Bowie did not contend in the bankruptcy court or the district court
and does not contend now that Magic is a "commission merchant" or a
"broker."

6

certain of Magic's assets as the beneficiary of PACA's
statutorily imposed trust. PACA defines the term"dealer" as
"any person engaged in the business of buying or selling in
wholesale or jobbing quantities, as defined by the
Secretary, any perishable agricultural commodity in

interstate or foreign commerce . . . ." 7 U.S.C.S 499a(b)(6).
PACA also provides three exceptions to this definition:

> (A) no producer shall be considered as a "deale r" in
> respect to sales of any such commodity of his own
> raising;

> (B) no person buying any such commodity solely for
> sale at retail shall be considered as a "dealer" until the
> invoice cost of his purchases of perishable agricultural
> commodities in any calendar year are in excess of
> $230,000; and

> (C) no person buying any commodity other than
> potatoes for canning and/or processing within the
> State where grown shall be considered a "dealer"
> whether or not the canned or processed product is to
> be shipped in interstate or foreign commerce, unless
> such product is frozen or packed in ice, or consists of
> cherries in brine . . . .

Id. Finally, this provision notes that "[a]ny person not considered as a `dealer' under clauses (A), (B), and (C) may elect to secure a license under the provisions of section 499c of this title, and in such case and while the license is in effect such person shall be considered as a `dealer'." Magic has never secured such a license, and contends that no restaurant has done so.

The parties do not dispute that Magic purchases "wholesale or jobbing quantities" of perishable agricultural commodities in interstate commerce.4 Bowie therefore contends that, based on the plain language of the statute, Magic is a "dealer" and is subject to the trust. The

_____

4. Regulations promulgated by the United States Department of Agriculture ("USDA") define "wholesale or jobbing quantities" as "aggregate quantities of all types of produce totaling one ton (2,000 pounds) or more in weight in any day shipped, received, or contracted to be shipped or received." 7 C.F.R. S 46.2(x).

7

bankruptcy court agreed, but the district court reversed. The court held that PACA "is silent on the issue of whether restaurants qualify as `dealers,' " and therefore, "Congress has not spoken directly to the issue of PACA's applicability to restaurants." (A.7). Thus, the district court proceeded to consider regulations promulgated by the USDA under its authority to administer PACA. See 7 U.S.C.S 499o.

These USDA regulations define "dealer" as:

> any person engaged in the business of buying or selling in wholesale or jobbing quantities in commerce and includes:
>
> (1) Jobbers, distributors and other wholesaler s;
>
> (2) Retailers, when the invoice cost of all pu rchases of produce exceeds $230,000 during a calendar year. In computing dollar volume, all purchases of fresh and frozen fruits and vegetables are to be counted, without regard to quantity involved in a transaction or whether the transaction was intrastate, interstate or foreign commerce;
>
> (3) Growers who market produce grown by others.

7 C.F.R. S 46.2(m). The district court concluded that under this regulation, in order to be a "dealer" an entity had to fall into one of the categories enumerated in 7 C.F.R. S 46.2(m)(1), (2), or (3). The court determined that the only

possible category a restaurant such as Magic could fall into was that of "retailers" under 7 C.F.R. S 46.2(m)(2), but concluded that restaurants such as Magic were consumers, not retailers. Accordingly, the district court held that under this USDA regulation, Magic was not a dealer.

The court found support for this conclusion in two additional sources. First, in 1996, USDA amended its regulatory definition of "fresh fruits and vegetables," 7 C.F.R. S 46.2(u), to include oil-blanched frozen fruits and vegetables, thereby bringing such produce within PACA's reach. In its statement accompanying publication of the final rule, USDA described a comment it received from a representative of a major restaurant chain voicing its concern that the rule change "might bring restaurants under the jurisdiction of the PACA." Final Rule,

"Regulations (Other Than Rules of Practice) Under the Perishable Agricultural Commodities Act, 1930 (PACA)," 61 Fed. Reg. 13385, 13386 (Mar. 27, 1996). USDA responded:

> Restaurants traditionally have not been considered subject to the PACA by USDA or Congress unless the buying arm of the restaurant is a separate legal entity, and is buying for and/or reselling the product to another entity. Since restaurants are not subject to the PACA, this change in the regulation will not impact restaurants.

Id.

Second, in 1995, Congress amended PACA. These amendments had no bearing on who was and was not covered by the statute.[5] In the report of the House Committee on Agriculture accompanying the 1995 PACA Amendments Act, the Committee explained that:

> Section 3 phases out license fees for retailers and grocery wholesalers. It defines the term "retailer" as a person who is a dealer engaged in the business of selling any perishable commodity at retail. Approximately 4,000 retailers are currently estimated to be licensed under PACA. Those businesses such as grocery stores and other like businesses that predominantly serve those consumers purchasing food for consumption at home or off the premises of the retail establishment are considered to be included in the definition of retailer. It is not the intent of the Committee that the definition of retailer be construed to include foodservice establishments such as

5. Essentially, the 1995 amendments phased retailers and grocery wholesalers out of license fee payment, allowed USDA to adjust license fees under its rulemaking authority, "require[d] USDA to receive a written complaint before pursuing an investigation, require[d] additional USDA investigation notification procedures, increase[d] . . . administrative penalties, establishe[d] civil penalties, clarifie[d] the status of collateral fees and expenses, and clarifie[d] misbranding prohibitions . . . ." H.R. Rep. No. 104-207, at 6 (1995), reprinted in 1995 U.S.C.C.A.N.

453, 453. Other than these changes, the House Committee on Agriculture explained, the law remained unaffected. Id.

9

> restaurants, or schools, hospitals and other
> institutional cafeterias.

H.R. Rep. No. 104-207, at 7 (1995), reprinted in 1995 U.S.C.C.A.N. 453, 454.

Accordingly, based on this regulatory interpretation and legislative history, the district court held that restaurants such as Magic are not "dealers" and are therefore not subject to PACA's trust provision.

## III.

The question of whether a restaurant with extensive operations such as Magic is a "dealer" under PACA is a purely legal determination. Accordingly, this court exercises plenary review over the judgment of the district court. In re Reading Co., 115 F.3d 1111, 1124 (3d Cir. 1997).

## A. The Statutory Language.

In resolving this issue, the first question we must ask is whether the plain language of the statute is unambiguous. Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197, 202 (3d Cir. 1998). If it is, there is generally no need to look to administrative interpretations or to legislative history. Ratzlaf v. United States, 510 U.S. 135, 147-48 (1994); Idahoan Fresh, 157 F.3d at 202; West v. Sullivan, 973 F.2d 179, 185 (3d Cir. 1992), cert. denied, 508 U.S. 962 (1993). If the statute is "silent or ambiguous as to the specific issue," and an administrative agency charged with administering the statute has devised its own regulatory interpretation of the statute, the court must then ask "whether the agency's answer is based on a permissible construction of the statute." West, 973 F.2d 179 at 185 (quoting Chevron, U.S.A., Inc. v. Natural Resources Def.

Council, Inc., 467 U.S. 837, 842-43 (1984)).

In the more than half-century since the initial enactment of PACA, only three other courts have addressed whether restaurants are "dealers" under it. We appear to be the only United States Court of Appeals to consider the question. Recently, two district courts in California concluded, like the bankruptcy court in this case, that restaurants are

10

"dealers" under the plain language of PACA. See Royal Foods Co. v. L.R. Holdings, Inc., No. C 99-01609, 1999 WL 1051978 (N.D. Cal. Nov. 10, 1999); JC Produce, Inc. v. Paragon Steakhouse Restaurants, Inc., 70 F. Supp.2d 1119 (E.D. Cal. 1999). However, in In re Italian Oven, Inc., 207 B.R. 839 (Bankr. W.D. Pa. 1997), the bankruptcy court, like the district court in this case, held that PACA's definition of "dealer" is ambiguous, that the USDA regulation defining "dealer" did so to the exclusion of anyone not expressly described by the regulation, and that the restaurant debtor in that case was not a retailer under this regulation and therefore not subject to PACA's trust provision. The Italian Oven court considered and expressly rejected the reasoning of the bankruptcy court in this case. Id. at 842-43.6

As noted above, USDA, the agency charged with administering PACA, has indicated its view that restaurants are not "dealers" under that statute. Indeed, that agency's consistent practice for seven decades since PACA's enactment has been to deny that the statute gives it jurisdiction over restaurants.7 Nevertheless, "a reviewing

_____

6. It gave three reasons in support of its holding that PACA's definition of "dealer" was ambiguous and resort to administrative materials was appropriate. The first reason was that prior to the bankruptcy court's decision in this case, there had been no reported decisions dealing with whether PACA applies to restaurants, even though the statute had been in existence since 1930. Id. at 843. The court's second reason is confusing, but appears to have had something to do with PACA's silence as to its applicability to restaurants. Id. The third reason was that PACA empowered the USDA to administer the statute by enacting regulations. Id. at 843-44. For the same reasons discussed herein, the Italian Oven court's first two reasons for looking beyond the plain statutory definition

of "dealer" are unconvincing to us. Additionally, its third reason is irrelevant to an inquiry into the ambiguity of statutory text.

7. This practice is further evidenced by USDA's communications with Magic. A July 6, 1995 letter to counsel for Magic from a USDA official apparently responsible for license and program review in the PACA

Branch of USDA's Fruit and Vegetable Division explained that official's view that "[r]estaurants are not considered `dealers,' `brokers,' `commission merchants' or any other entity whose operations are subject to the PACA," and that "[t]he PACA is not applicable to a restaurant that does not act as a central distributor for subsidiary restaurants irrespective of where it obtains it perishable commodities." (A.16).

court should not defer to an agency position which is contrary to an intent of Congress expressed in unambiguous terms." Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 476 (1992).

Ultimately, this case turns on whether the statutory definition of "dealer" found in PACA is unambiguous with respect to its inclusion of restaurants such as Magic. As discussed above, PACA states that subject to certain exceptions, a dealer is "any person engaged in the business of buying or selling in wholesale or jobbing quantities, as defined by the Secretary, any perishable agricultural commodity in interstate or foreign commerce . . . ." 7 U.S.C. S 499a(b)(6). Because "the term `person' includes individuals, partnerships, corporations, and associations," id. S 499a(b)(1), Magic is a "person" under PACA. Furthermore, the parties do not dispute that Magic purchased "wholesale or jobbing quantities" of produce, which USDA regulations define as "aggregate quantities of all types of produce totaling one ton (2,000 pounds) or more in weight in any day shipped, received, or contracted to be shipped or received." 7 C.F.R. S 46.2(x). Additionally, Magic does not contend that it falls within any of the three statutory exceptions to PACA's definition of "dealer." See 7 U.S.C. S 499a(b)(6)(A), (B), and (C).

At oral argument in this case, it was suggested that Congress's employment of the words "engaged in the business of " in defining the category of "dealers" rendered this definition ambiguous, because this language could be interpreted to restrict the meaning of "dealer" to include only those engaged primarily in the business of buying or selling perishable agricultural commodities. However, nothing about the ordinary meaning of the words "engaged" or "business" indicates that the statutory definition should be understood to apply only to those engaged primarily in this business. This "engaged in the business of " language speaks to the type of business required to invoke jurisdiction under PACA, not to the quantity thereof. Congress spoke to quantity later in this definition, when it

restricted the category of "dealers" to those doing business "in wholesale or jobbing quantities."[8]

There is therefore nothing ambiguous about the application of this statutory definition to the facts of this case. The district court's conclusion that the definition is ambiguous because it does not explicitly state whether restaurants are dealers is specious. Because Congress chose to define the word "dealer" in broad terms, rather than by specifically identifying each entity that falls into this category, does not automatically render the definition ambiguous.

B. The Statutory Purpose.

Even where the express language of a statute appears unambiguous, a court must look beyond that plain language where a literal interpretation of this language would thwart the purpose of the overall statutory scheme, United States v. Jersey Shore Bank, 781 F.2d 974, 977 (3d Cir. 1986), aff 'd, 479 U.S. 442 (1987), would lead to an absurd result, id., or would otherwise produce a result "demonstrably at odds with the intentions of the drafters,"

_____

8. The interpretation given to the definition of "dealer" in the Packers and Stockyards Act, 7 U.S.C. S 181 et seq. ("PSA"), lends additional support to this conclusion. PACA's trust provision was modeled on that of the PSA, and this court has previously observed that authority developed under the PSA is persuasive in interpreting PACA's trust. See Consumers Produce, 16 F.3d at 1382 n.5. Using language nearly identical to that used in PACA, the PSA defines a "dealer" as "any person . . . engaged in the business of buying or selling in commerce livestock at a stockyard . . . ." Id. S 201(d). The only decision interpreting the PSA's "engaged in

the business of " language of which we are aware confirms our interpretation of PACA's identical language. See Kelley v. United States, 202 F.2d 838, 841 (10th Cir. 1953) ("engaged in the business of " language cannot be read to mean engaged in the sole business of); see also United States v. Perdue Farms, Inc., 680 F.2d 277, 285 (2d Cir. 1982) (interpreting PSA's nearly identical definition of "live poultry dealer," 7 U.S.C. S 218b (repealed 1987), and concluding that "rather than focusing upon the absolute amount of packing business or live poultry business a firm engaged in, Congress chose to make the USDA's jurisdiction dependent upon the activity of the business . . . , no matter how small . . . .").

13

Demarest v. Manspeaker, 498 U.S. 184, 190 (1991) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571

(1982)).

Nevertheless, it cannot be seriously contended that holding that restaurants purchasing perishable agricultural commodities in wholesale or jobbing quantities, as defined by the Secretary, are "dealers" under PACA is contrary to the statute's purpose, absurd, or "demonstrably at odds with the intentions of the drafters." There is no clear evidence of legislative intent regarding treatment of such restaurants at the time the definition of "dealer" was originally enacted in 1930. Indeed, the only such evidence of legislative intent is the statement contained in the 1995 House Agriculture Committee report that the Committee did not intend that restaurants be included within the definition of "retailers" enacted in the 1995 PACA Amendments Act. That statement, however, is confined to the amendment. This committee report was issued more than 30 years after the last time Congress modified the definition of "dealer" in any substantial way,9 and dealt with issues wholly different from this definition. See supra note 6. This report language is not something "upon which other legislators might have relied in voting for or against" the statutory definition of "dealer," and cannot constitute evidence of the legislative intent behind that definition. See Heintz v. Jenkins, 514 U.S. 291, 298 (1995). As the Supreme Court has observed, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." United States v. Price, 361 U.S. 304, 313 (1960); see also Pennsylvania Med. Society v. Snider, 29 F.3d 886, 898 (3d Cir. 1994). We therefore disregard this House committee report.

_____

9. Pub L. No. 87-725, 1962 U.S.C.C.A.N. 2749, substituted "wholesale or jobbing quantities" for "carloads." Amendments in 1969, 1978, and 1981 increase the monetary amount under current section 499a(b)(6)(B) from $90,000 to $100,000, $100,000 to $200,000, and $200,000 to $230,000, respectively. See Pub. L. No. 97-98, 1981 U.S.C.C.A.N. (95 Stat.) 1213, 1269; Pub. L. No. 95-562, 1978 U.S.C.C.A.N. (92 Stat.) 2381; Pub. L. No. 91-107, 1969 U.S.C.C.A.N. 1225. In addition, the 1978 amendment inserted "other than potatoes" after "commodity" in current section 499a(b)(6)(C). See Pub L. No. 95-562, 1978 U.S.C.C.A.N. (92 Stat.) 2381.

14

Moreover, requiring restaurants that purchase large quantities of produce to comply with PACA furthers the goals of the statute as amended in 1984. Although the original PACA was enacted to protect produce growers and producers, the 1984 amendments, including the trust provision, were enacted for the protection of all produce sellers and suppliers. Holding restaurant-purchasers responsible to produce sellers such as Bowie provides

protection of produce suppliers up through the distribution chain and therefore furthers the purposes of the trust provision.

Magic contends that if this court holds that restaurants are "dealers," and therefore subject to PACA, the repercussions would be "staggering" because"all of the hundreds of thousands of restaurants in this country" that have never applied for licenses under PACA "have been in direct violation of federal law, for decades." (Appellee's Br. at 18–19). To some extent, Magic may have a point. Under PACA, any person failing to obtain a license through inadvertence rather than wilfulness may "be permitted by the Secretary . . . to settle his liability in the matter by the payment of fees due for the period covered by such violation and an additional sum, not in excess of $250, to befixed by the Secretary . . . ." 7 U.S.C. 499c(b). Should the Secretary choose to pursue such violations, these licensing fees could add up to substantial amounts over the 70–year period in which PACA has been in force.

It is not clear how many restaurants actually purchase produce in "wholesale or jobbing quantities," and are therefore subject to PACA's licensing requirement. The parties have offered no evidence on this point. We suspect, however, that the number of restaurants that do so is far smaller than Magic contends. In addition, we would be very surprised if the Secretary chose to pursue enforcement of such violations retroactively. Even if the Secretary does attempt to enforce PACA's penalty provisions against these "violating" restaurants, the long history of non-enforcement against restaurants in this case may be sufficiently extraordinary as to permit restaurants to successfully argue the application of equitable estoppel or laches.

15

We recognize that the USDA has refused to exercise jurisdiction over restaurants pursuant to PACA for approximately seven decades. It is this benign neglect that is responsible for much of the confusion in this area. Nevertheless, we are constrained by PACA's unambiguous statutory language to hold that a restaurant such as Magic, which purchases produce in wholesale or jobbing quantities (and in excess of $230,000 per year), is a "dealer" under 7 U.S.C. S 499a(b)(6), and administrative interpretations contrary to this plain language are therefore not persuasive.

IV.

For the foregoing reasons, the January 6, 1999 order of the district court will be reversed, and the case remanded to the district court with instructions to reinstate the

January 15, 1997 order of the bankruptcy court granting partial summary judgment in favor of Bowie. Each side to bear its own costs.

RENDELL, Circuit Judge, dissenting:

I respectfully dissent because I find the phrase "engaged in the business of buying or selling . . ." to be susceptible of a different meaning from that given it by the majority.

Restaurants are engaged in the business of preparing and selling meals to customers. Not only is buying or selling perishables in large quantities not their primary business, it is not their business at all. 10 Admittedly, in the course of their business, they do buy perishables in great quantities. If PACA was intended to include them, Congress should have said, "any business that buys or sells . . ."; it did not. As I read the statute, it confines the concept of "dealer" to those who do this as their bread and butter, so to speak. The majority reading would make most prisons "dealers," yet prisons are not engaged in the perishable commodity-buying business.

The reading I have proffered, together with the majority's rejection of it, leads me to conclude that the statutory language is ambiguous. Once we have found an ambiguity in the statutory language, our resort to legislative history would confirm that PACA is not intended to cover restaurants and food service institutions. In discussing the definition of "retailer" (which relies in part on the definition of dealer), the House Report made clear that food service establishments such as restaurants or schools, hospitals,

_____

10. The majority relies by analogy upon the Kelley case, which found that the Packers and Stockyards Act did not require a dealer to be engaged solely in the business of selling livestock. See Kelley v. United States, 202 F.2d 838 (10th Cir. 1953). This analogy is inapposite. In Kelley, the livestock dealer was clearly engaged in the business of selling

livestock. Kelley was a proprietor of a stockyard that, because it was private, was not itself subject to the Packers and Stockyards Act. See id. at 839. The Tenth Circuit Court of Appeals found that, by buying livestock from stockyards that were subject to the Act, Kelley became a "dealer" subject to the registration and bond requirements of the Act. See id. at 841. That is, the issue in Kelley was whether the livestock dealer had to be registered when his dealing in livestock subject to the Act was not his sole business due to the fact that his sales of other livestock might predominate. There is no question that the core of Kelley's business was dealing livestock, and this clearly distinguishes his case

from the instant case where Magic's business is not dealing in produce.

17

and other institutional cafeterias are not required to be licensed. The agency's construction of PACA is consistent with this position.[11] In short, dealers and brokers are those whose business is in dealing in, or brokering, these items. They should be licensed and are subject to the Act. Magic is engaged in a very different business, and is not in my view subject to regulation as a "dealer" under PACA.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

_____

11. The majority notes that we "should not defer to an agency position which is contrary to an intent of Congress expressed in unambiguous terms." Ante at 12 (quoting Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 476 (1992)). Here, however, the only unambiguous statement of Congressional intent appears in the House Report. The agency's position is consistent with the intent expressed in the legislative history.
See In re The Italian Oven, Inc., 207 B.R. 839, 843–44 (Bankr. W.D. Pa. 1997) (describing agency position on, and legislative history of, the "dealer" provision of PACA).

18