**FEDERAL ELECTION COMMISSION,**
Plaintiff,

v.

**ARLEN SPECTER '96,**
et al., Defendants.

**Civil Action No. 00–CV–3167.**

United States District Court,
E.D. Pennsylvania.

July 26, 2001.

Lois G. Lerner, Acting General Counsel, Washington, DC, for Federal Election Commission.

Thomas A. Leonard, Stephen W.W. Ching, Jr., Obermayer Rebmann Maxwell Hippel LLP, Philadelphia, PA, for Arlen Specter '96, Paul S. Diamond.

Bruce G. Joseph, Jan Witold Baran, Thomas W. Kirby, Wiley, Rein & Fielding, Washington, DC, for Koro Aviation, Inc.

## MEMORANDUM

JOYNER, District Judge.

This is a federal election law case brought by the Federal Election Commission ("FEC" or "Commission") against Defendants Arlen Specter '96, the campaign committee of United States Senator Arlen Specter during his unsuccessful 1996 presidential campaign; Paul S. Diamond, Treasurer of Arlen Specter '96 (collectively, "Specter '96"); and Koro Aviation, Inc. ("Koro"). In its Complaint, the FEC alleges that Specter '96 violated certain sections of the Federal Election Campaign Act of 1971, 2 U.S.C. § 431, *et seq.* ("FECA") by accepting an unlawful in-kind contribution from Koro in the form of the unreimbursed value of charter air travel. Before the Court are (1) Specter '96's Motions to Dismiss and for Summary Judgment; (2) Koro's Motion to Dismiss; and (3) the FEC's Cross–Motion for Partial Summary Judgment and Motion to Strike. For the reasons that follow, we will deny all of the Motions.

## BACKGROUND

Arlen Specter currently is the senior United States Senator from Pennsylvania. In March 1995, Senator Specter announced his candidacy for the Presidency of the United States. Shortly thereafter, he formed Specter '96, which served as his authorized campaign committee for the duration of his presidential campaign. Senator Specter remained an active presidential candidate until November 22, 1995, when he announced his withdrawal from the race.

Koro is a commercial air charter service based in Hazelton, Pennsylvania. Prior to 1990, Koro was known as KAMA Plastics Company ("KAMA"), a private company engaged in the manufacture of plastic products. In 1990, KAMA sold its plastics manufacturing operations and converted its air fleet into a commercial charter business, renaming the new company Koro. The newly formed Koro obtained an Air Carrier Certificate from the Federal Aviation Administration ("FAA") in June 1990. (*See* FEC Resp.Mem. at 3 & Ex. 3).[1]

Beginning in 1986, Senator Specter traveled for both official and campaign-related purposes on aircraft owned by KAMA. After KAMA became Koro in 1990, Senator Specter continued to use Koro aircraft for official and campaign purposes, including during the 1996 presidential campaign, just as he had before the corporate change. Throughout his relationship with the company, Senator Specter paid KAMA/Koro first-class airfare for flights between cities with regularly scheduled commercial service, a practice he believed to be in accord with applicable Senate and FEC rules.

During the 1996 presidential campaign, the FEC, pursuant to its statutory obligation, audited all presidential campaigns that received federal matching funds. Because Specter '96 received matching funds in excess of $1 million, it was subject to a normal FEC audit, which occurred in May 1996. As a result of the May 1996 audit, the FEC Audit Division ("Audit Division") determined that Specter '96 had committed three election code violations, only one of which is at issue in this case.[2] According to the Audit Division's findings, "Koro made and [Specter '96] received a prohibited in-kind contribution of at least $155,251." (*See* Exit Conf.Mem. of the Audit Div. at Specter '96 App. A, p. 14A).[3] The Audit Division reached this conclusion based on its determination that the applicable regulations required Specter '96 to pay a full charter fare—not a first-class fare—for travel on Koro planes. Because Specter '96 only paid a first-class fare, the Audit Division found the difference in value between Koro's charter rate and a first-class rate to represent an in-kind contribution to Specter '96. (*See id.* at 12A–18A). Specter '96 contested these initial findings, claiming that it had followed the applicable

---

1. For a discussion of the procedure for obtaining an Air Carrier Certificate and related issues, see 14 C.F.R. Pt. 119.

2. The Audit Division found that Specter '96 (1) accepted $83,769 in excess contributions from individuals; (2) had three checks outstanding to vendors that had not been cashed in the amount of $3,562; and (3) should have paid a full charter fare, instead of a first-class fare, for flights on Koro aircraft. Specter '96 did not dispute the first two findings and, consequently, issued a check to the United States Treasury covering the amounts owed by virtue of those violations. Specter '96 disputed the third finding regarding the proper fare for air travel, which is the subject of the instant action.

3. Future citations to materials within Specter '96's Appendices will be referred to by page number and the corresponding appendix number. For example, a document appearing at page 28 of Appendix A will be referred to as "28A."

regulations and that the Audit Division's construction of those regulations amounted to rewriting them. (*See* Diamond 2/11/97 letter at 25A–30A; Specter 2/11/97 letter at 31A).

After completing its investigation and findings, the Audit Division submitted its audit report of Specter '96 to the FEC for approval at the FEC Commissioners' June 12, 1997 meeting. (Audit Div. 5/29/97 Mem. at 34A). The Commissioners in turn approved the audit report at that meeting. (*See* Minutes of 6/12/97 FEC meeting at 61A–75A). Next, on November 12, 1997, the Commission voted to open an official Matter Under Review ("MUR") and, based on the accompanying Factual and Legal Analysis, found that there was reason to believe that Specter '96 violated FECA. (*See* FEC 11/20/97 letter & attch. at 109A–116A). The Commission then informed Specter '96 that it had the opportunity to respond to the Factual and Legal Analysis and to enter into a pre-probable cause conciliation agreement. (*Id.*) On July 29, 1999, the Commission forwarded Specter '96 a proposed pre-probable cause conciliation agreement. (Kay 7/29/99 letter & attch. at 133A–138A). Specter '96 rejected that agreement, and advised the Commission to proceed with its probable cause brief. (Diamond 8/5/99 letter at 139A–140A).

The FEC General Counsel's Office, Specter '96, and Koro submitted to the Commission their respective briefs in favor of and in opposition to finding probable cause in October 1999. (*See* Gen. Counsel Brief at 144A–154A; Specter '96 Brief at 155A–174A; Koro Brief at 197A–229A; *see also* Specter Supp. Brief at 188A–196A). After consideration of the briefs, the Commission found on December 14, 1999, that there was probable cause to believe that Specter '96 and Koro violated FECA. Pursuant to that determination, the Commis-

sion sent Specter '96 a post-probable cause conciliation agreement. (*See* FEC 1/5/00 letter at 230A–234A). Specter '96 rejected this second conciliation agreement, restating its view that the claims against it were without merit. (Diamond 2/9/00 letter at 235.1A). Because of its inability to settle the case through conciliation, the FEC filed the instant civil action on June 22, 2000. (*See* FEC 6/15/00 letter at 236A).

## DISCUSSION

### I. *Regulations At Issue*

FECA prohibits political campaigns from receiving contributions from corporations. 2 U.S.C. § 441b(a); *see also* 2 U.S.C. § 431(8)(A)(i) (defining "contribution"). The heart of the dispute in this case is the proper interpretation, and consequent application or non-application, of two regulations issued by the Commission pursuant to this statutory prohibition. Specter '96 argues that 11 C.F.R. § 114.9(e) governs the issues before the Court. Section 114.9 addresses generally the use of corporate or labor organization facilities and means of transportation. Subsection (e) of that section states, in pertinent part:

*Use of airplanes and other means of transportation*

(1) A candidate, candidate's agent, or person traveling on behalf of a candidate who uses an airplane which is owned or leased by a corporation or labor organization other than a corporation or labor organization licensed to offer commercial services for travel in connection with a Federal election must, in advance, reimburse the corporation or labor organization—

(i) In the case of travel to a city served by regularly scheduled commercial service, the first class air fare;

(ii) In the case of travel to a city not served by a regularly scheduled commercial service, the usual charter rate.

Based on its reading of § 114.9(e), Specter '96 maintains that it was only required to pay first-class airfare for Koro flights that were to cities served by regularly scheduled commercial service.[4] The Commission, however, claims that § 114.9(e) is inapplicable to this case because that section deals only with campaign travel on aircraft owned by corporations or unions that are *not engaged* in the commercial air transportation business, whereas Koro was a corporation that *was engaged* in the commercial air transportation business. Instead, the Commission argues that 11 C.F.R. § 100.7 applies. That regulation derives from 2 U.S.C. § 431(8), which defines a contribution as "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing an election for Federal office." Building upon the statutory definition, 11 C.F.R. § 100.7(a)(1)(iii)(A) provides that:

[T]he term "anything of value" includes all in-kind contributions. Unless specifically exempted under 11 C.F.R. 100.7(b), the provision of any goods or services without charge or at a charge which is less than the usual and normal charge for such goods or services is a contribution..... If goods or services are provided at less than the usual and normal charge, the amount of the in-kind contribution is the difference between the usual and normal charge for the goods or services at the time of the contribution and the amount charged the political committee.

Based on § 100.7(a)(1)(iii)(A), the Commission asserts that Specter '96, by only paying first-class fares instead of full charter fares on Koro, received an unlawful corporate in-kind contribution.

Thus, the fundamental issue is whether § 114.9(e) applies to this case. That issue turns on the proper interpretation of the exclusionary clause contained within the text § 114.9(e), to wit, "other than a corporation or labor organization licensed to offer commercial services *in connection with a Federal election....*" (emphasis added). If the exclusionary clause is properly understood as applying to only those corporations that have a special license to offer commercial services specifically connected with a federal election, then the clause would not exclude Koro from the purview of § 114.9(e). As a result, the valuation formula set out in § 114.9(e)(1)(i) would govern the flights at issue in this case, thereby confirming that Specter '96 correctly paid first-class fares for those flights. Conversely, if the exclusionary clause is properly understood to apply to all corporations that simply are licensed to provide commercial travel services, then the clause would exclude Koro from § 114.9(e)'s coverage. As a result, the more general valuation formula described in § 100.7(a)(iii)(A) would govern the flights at issue, and Specter '96 would be liable for the full charter fare for those flights.

## II. *Motion to Dismiss*

### A. *Legal Standard*

When considering a motion to dismiss under Rule 12(b)(6), a court must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." *Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir.2000) (in-

---

4. It is undisputed that the flights at issue in this case were taken between cities served by regularly scheduled commercial service.

ternal quotations omitted). A motion to dismiss may only be granted where the allegations fail to state any claim upon which relief can be granted. *See Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir .1997). Dismissal is warranted "if it is certain that no relief can be granted under any set of facts which could be proved." *Klein v. General Nutrition Cos., Inc.*, 186 F.3d 338, 342 (3d Cir.1999) (internal quotations omitted). Although generally courts may not look beyond the complaint in deciding a motion to dismiss under Rule 12(b)(6), they may consider "an undisputedly authentic document that a defendant attaches to a motion to dismiss if the plaintiff's claims are based on that document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993) (internal quotations omitted). In this case, there are numerous documents from the administrative proceedings below and other materials of public record that are undisputably authentic. (*See* Specter '96 Mem. at 4–6 (listing materials)). To the extent we undertake consideration of these materials, that consideration does not convert Specter '96 or Koro's Motion to Dismiss into a summary judgment motion. *See id.; Halstead v. Motorcycle Safety*

*Found.*, 71 F.Supp.2d 464, 467 (E.D.Pa. 1999).[5]

\* \* \* \* \* \*

In its Motion to Dismiss,[6] Specter '96 makes two basic arguments in the alternative: (1) § 114.9(e), by its terms, applies to this case and directs that Specter '96 needed to pay only first class airfare; or, if § 114.9(e) does not apply, (2) the appropriate regulations exceed the statutory authority given by Congress under FECA. We address these arguments in seriatim.

## B. Applicability of § 114.9(e)

In general, courts give "substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (citations omitted). Our job is not to determine which among several competing interpretations is best; rather, an agency's interpretation must be given controlling weight unless it is either plainly erroneous or inconsistent with the regulation. *Id.* In other words, we will defer to the agency's interpretation of its regulation unless an "alternate reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *Id.; Trin-*

---

**5.** The vast majority of the documents that the FEC moves to strike relate solely to Specter '96 and Koro's Motions for Summary Judgment. We address the FEC's arguments on this issue in Part III, *infra*. However, the FEC also moves to strike 165 pages of Specter '96's exhibits that do affect the parties' Motions to Dismiss. (*See* Specter '96 Appendix A, Vol. IV, pp. 2000A–2165A). These documents consist entirely of FEC rulemaking materials, including a prior Petition for Rulemaking, public comments regarding the Petition, and the FEC's response to and disposition of the Petition. Nearly all of the listed materials appeared in the Federal Register and are widely available on electronic databases such as WestLaw. The FEC provides scant support for striking any of these partic-

ular documents. In view of the long line of cases affirming that a court may look to "court files, records and letters of official actions or decisions of government agencies and administrative bodies" when considering a Rule 12(b)(6) motion, *Arizmendi v. Lawson*, 914 F.Supp. 1157, 1160–61 (E.D.Pa.1996), we deny the FEC's Motion to Strike with respect to these documents.

**6.** Because Specter '96 and Koro's Motions to Dismiss are in large part identical, we will address them together and refer only to "Specter '96's" motion, except where otherwise indicated. Our analysis of the claims applies with equal force to the analogous claims in Koro's motion.

*ity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 624–25 (D.C.Cir.2000) (citing *Thomas Jefferson Univ.*); *Connecticut Gen. Life Ins. Co. v. CIR*, 177 F.3d 136, 144 (3d Cir.1999) (same).

Following the outlines set forth by the Supreme Court, Specter '96 argues that the FEC's alternative interpretation of § 114.9(e): (1) violates the plain language of the regulation; and (2) violates prior, binding FEC precedent on this precise issue. In addition, Specter '96 forwards a third argument, namely, that even if the FEC's interpretation of § 114.9(e) is permissible, enforcement based on that interpretation would violate Specter '96's due process rights because of insufficient notice.

### (1) *Plain Language of § 114.9(e)*

As always, our interpretation of a statute or regulation begins with the statute or regulation's language itself. *See Bread Political Action Comm. v. FEC*, 455 U.S. 577, 580, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982); *In re United Healthcare Sys., Inc.*, 200 F.3d 170, 176 (3d Cir.1999). Extracting the language inapplicable to the instant case, § 114.9(e) states that: "A candidate who uses an airplane which is owned by a corporation other than a corporation licensed to offer commercial services for travel in connection with a Federal election must, in advance, reimburse the corporation." Specter '96 argues that the clause "for travel in connection with a Federal election" modifies the preceding term "services." Based on that construction, Specter '96 notes that Koro is not a "corporation licensed to offer commercial services for travel in connection with a Federal election" and, therefore, the exclusionary clause within § 114.9(e) does not apply. It follows then, in Specter '96's view, that § 114.9(e) governs the reimbursement process in this case. Because Specter '96 acted in accordance with § 114.9(e), it concludes that it did not commit a violation of FECA.

The Commission, not surprisingly, reads the quoted passage differently. In its view, "for travel in connection with a Federal election" does not modify "services," but rather describes the type of travel involved. Put another way, under the FEC's construction, "for travel in connection with a Federal election" modifies the verb "uses," which appears in the regulation several lines above the exclusionary clause. Under this construction, the exclusionary clause consists only of the phrase "other than a corporation licensed to offer commercial services." Because Koro is admittedly a corporation licensed to offer commercial services, the Commission argues that § 114.9(e) is inapplicable by virtue of the exclusionary clause, and the more general prohibition against corporate, in-kind donations applies, *see* § 100.7.

We agree that Specter '96's reading of § 114.9(e) may be the more natural of the two. However, § 114.9(e)'s lack of punctuation and less-than-artful drafting make it difficult, if not impossible, to divine the true meaning of the regulation by cursorily reading it. Perhaps recognizing that fact, both parties point to various principles of statutory interpretation to aid our analysis of the regulation's plain language.

Specter '96 relies largely on the "doctrine of the last antecedent" for support of its position. Under that doctrine, "qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to and including others more remote." *Elliot Coal Mining v. Director, Office of Workers' Compensation Programs*, 17 F.3d 616, 629 (3d Cir.1994) (internal quotations omitted); *see also* 2A Norman J. Singer, *Sutherland Statutory Construction* § 47:33 (6th ed. 2000) ("Referential and qualifying words and phras-

es, where no contrary intention appears, refer solely to the last antecedent. The last antecedent is the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence.") (internal footnotes and quotations omitted). As Specter '96 points out, straight-forward application of the doctrine of the last antecedent in this case would compel the conclusion that "for travel in connection with a Federal election" modifies the noun "services" immediately preceding it.

The FEC responds that the doctrine of the last antecedent is far too weak of authority to establish the plain language of § 114.9(e), especially where there are other indicators suggesting a different interpretation. *See Tippins Inc. v. USX Corp.,* 37 F.3d 87, 93–94 (3d Cir.1994) (noting that doctrine of last antecedent holds that modifier's reference is to the closest noun "absent a clear intention to the contrary" and refusing to apply doctrine where contrary reading was supported by other evidence); *Texas Mun. Power Agency v.*

*EPA,* 89 F.3d 858, 877 (D.C.Cir.1996) (stating that rule of last antecedent is "not an inflexible rule, and is not applied where the context indicates otherwise"); *see also Young v. Community Nutrition Inst.,* 476 U.S. 974, 980–81, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986) (observing that "the English language does not always force a writer to specify which of two possible objects is the one to which a modifying phrase relates" and finding agency's interpretation of ambiguous statute reasonable). In this case, the FEC finds support for its interpretation in several official, publicly available agency publications that construe § 114.9(e) in the same manner as the FEC does here.[7] The FEC concludes that these materials constitute a clear intention to the contrary of Specter '96 view's and are more indicative of the meaning of § 114.9(e) than mechanical application of the doctrine of the last antecedent.

The FEC further argues that Specter '96's reading, while in accord with the

7. The materials pointed to include the FEC's Explanation and Justification of § 114.9(e), which was published contemporaneously with the promulgation of the regulation. *See* 1 Fed. Election Camp.Fin. Guide (CCH) ¶ 930 ("[Section 114.9(e)] allows candidates ... to use airplanes owned ... by a corporation ... which is not licensed to offer commercial services provided that the corporation is reimbursed in advance for the use. The advance reimbursement is required because the corporation ... is not in the regular business of offering commercial transportation for credit."). In addition, the FEC notes that it publishes and widely circulates a "Campaign Guide for Congressional Candidates and Committees," which outlines the various rules and regulations under FECA. This publication also adheres to the FEC's present interpretation of § 114.9(e). *See id.* at ¶ 7511 ("A candidate ... may use an airplane owned ... by a corporation that is not licensed to offer commercial services (one that is not an 'air carrier' under the Federal Aviation Administration rules)."). A similar manual, the

"Campaign Guide for Corporations and Labor Organizations," is distributed specifically for use by corporations and unions involved in federal elections and likewise adheres to the FEC's present interpretation. *See id.* at ¶ 7521 ("a candidate ... may, in connection with a federal election, use an airplane owned or leased by ... a corporation that is not licensed to offer commercial service (i.e., that is not an 'air carrier' under the Federal Aviation Administration rules)."). Finally, the FEC highlights its "Financial Control and Compliance Manual For Presidential Primary Candidates Receiving Public Financing," which is sent to every candidate qualifying for federal matching funds. This manual states: "To varying degrees campaigns make use of aircraft for campaign travel which are owned or operated by labor organizations or corporations *not licensed to offer commercial services.* When such aircraft are used the rate of reimbursement is controlled by Section 114.9(e) of the Commission's regulations." *See* Aff. of T. Nuthern at FEC Ex. 9, Attch. A (emphasis added).

doctrine of the last antecedent, would violate other well-known principles of statutory construction. First, it maintains that Specter '96's construction of § 114.9(e)'s exclusionary clause puts the regulation in conflict with the larger statutory and regulatory scheme. (FEC Resp.Mem. at 10–11, 13). "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (internal quotations and citations omitted). "A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole." *Id.; see also In re First Merchants Acceptance v. J.C. Bradford & Co.*, 198 F.3d 394, 402 (3d Cir.1999) (courts are "enjoined to interpret statutes in light of the context of the statutory scheme").

The FEC claims that under Specter '96's reading, a campaign committee would be able to elude the general rule in § 100.7(a)(1)(iii) that prohibits in-kind contributions in the form of discounted commercial services. (FEC Resp.Mem. at 11). The FEC's view is premised on the regulatory distinction between travel on aircraft owned by corporations not in the transportation business and travel on aircraft owned by commercial charter services. With respect to the former, because these corporations are not in the business of transporting passengers, they have no established "usual and normal" fare. Consequently, application of § 100.7, which uses the term "usual and normal charge" as a valuation baseline to determine whether a candidate has received an in-kind contribution, is not possible. To fill this void, § 114.9(e) provides that travel on ordinary corporate aircraft, i.e. aircraft without an established "usual and normal charge," shall be valued at a first-class or charter fare, depending on the availability of regularly scheduled air service to the given destination.[8] With respect to commercial charter flights, however, there is an established "usual and normal" fare. Thus, the Commission asserts that, because Koro was a commercial charter service that did have established "usual and normal" fares, § 100.7 governs the valuation. In turn, the Commission maintains that Specter '96's alternative, and significantly broader, reading of § 114.9(e) directly conflicts with the general prohibition against in-kind donations and would eviscerate the overall purpose of the regulatory scheme.

Second, relying on another principle of statutory construction, the FEC responds that Specter '96's interpretation of § 114.9(e) either would fail to give meaningful effect to all of the language in that section or would lead to an absurd result. It is well-established that a "cardinal principle of statutory construction ... [is to] give effect, if possible, to every clause and word of statute ... rather than emasculate an entire section." *Bennett v. Spear*, 520 U.S. 154, 173, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). "[I]nterpretation of a statute involves the examination of the statute as a whole," and "[i]n that sense, we must endeavor to give each word of the statute operative effect." *Smith v. Magras*, 124 F.3d 457, 462 (3d Cir.1997) (citing *Walters v. Metropolitan Educ. Enters.*, 519 U.S. 202, 209, 117 S.Ct. 660, 136

**8.** The value accorded is intended to reflect the value of the travel to the candidate. Thus, if the travel is to a city where normal commercial flights regularly fly, the value is assumed to be that of a first-class ticket on a commercial flight. If, however, the travel is to a city not served by regularly scheduled commercial service, then the value is assumed to be that of a chartered flight to that destination.

L.Ed.2d 644 (1997)); *see also ErieNet, Inc. v. Velocity Net, Inc.,* 156 F.3d 513, 516 (3d Cir.1998) ("[W]e must construe the statute 'so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void, or insignificant.' ") (quoting *Pennsylvania Med. Soc'y v. Snider,* 29 F.3d 886, 895 (3d Cir.1994)). Similarly, statutory interpretations "which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Id.* (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)); *see also In re Magic Rests., Inc.,* 205 F.3d 108, 116 (3d Cir.2000) (court must "look beyond the plain language where a literal interpretation of this language would thwart the purpose of the overall statutory scheme, could lead to an absurd result, or would otherwise produce a result demonstrably at odds with the intentions of the drafters.") (internal citations and quotations omitted).[9]

On these bases, the Commission contends that Specter '96's interpretation of § 114.9(e) would make that regulation's exclusionary clause a complete nullity because there is, in fact, no such thing as a special license to offer commercial air service in connection with a federal election. As a result, reading the regulation as Specter '96 does would either make the entire exclusionary clause meaningless or would produce the absurd result of requiring a license that does not exist.

 Finally, beyond its specific responses to Specter '96's argument, the Commission makes the more fundamental point that, even if Specter '96's interpretation of § 114.9(e) is more plausible, the Commission's reading is due substantial deference so long as it is reasonable. *See, e.g., Trin-*

*ity Broad.,* 211 F.3d at 625. The Commission emphasizes that this is especially true when the interpretation involves an agency's own regulation. *See, e.g., Facchiano Constr. Co., Inc. v. United States Dep't of Labor,* 987 F.2d 206, 213 (3d Cir.1993) ("an administrative agency's interpretation of its own regulation receives even greater deference than that accorded to its interpretation of a statute.")

In its Reply, Specter '96 both attempts to counter the Commission's responses and forwards several new arguments. First, with respect to the underlying issue of the amount of deference owed to the Commission's interpretation, Specter '96 argues that no deference is due when an agency's interpretation deviates from the plain language of a regulation. *See, e.g., Public Employees Ret. Sys. of Ohio v. Betts,* 492 U.S. 158, 171, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989); *Brown v. Gardner,* 513 U.S. 115, 122, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994). Following similar reasoning, Specter '96 also rejects the Commission's claim that, because Specter 96's reading of § 114.9(e) may lead to an absurd or nonsensical result, the alternative reading must prevail. In this respect, Specter '96 cites a long line of cases for the common-sense proposition that statutory and regulatory language must be followed as written and that any perceived ill-results flowing from the language must be corrected by legislation, not judicial interpretation. *See, e.g., United States v. Missouri Pac. R.R. Co.,* 278 U.S. 269, 277–78, 49 S.Ct. 133, 73 L.Ed. 322 (1929); *Johns–Manville Corp. v. United States,* 855 F.2d 1556, 1567 (Fed.Cir.1988); *see also Crooks v. Harrelson,* 282 U.S. 55, 60, 51 S.Ct. 49, 75 L.Ed. 156 (1930) (noting that literal terms of statute are only overridden if absurdity "so

---

9. This fundamental principle also applies to the interpretation of regulations. *See Idahoan Fresh v. Advantage Produce, Inc.,* 157 F.3d 197, 202 (3d Cir.1998) (citing *Silverman v. Eastrich Multiple Investor Fund, LP,* 51 F.3d 28, 31 (3d Cir.1995)).

gross as to shock the general moral or common sense."); *St. Louis Co. v. United States*, 237 F.2d 151, 158 (3d Cir.1956) (citing *Crooks* and finding that detailed code provisions had clear meaning notwithstanding hardship they caused party).

Both of Specter '96's above arguments suffer from the same shortcoming. In each case cited, the language of the statute or regulation at issue was unmistakably clear. *See, e.g., Betts*, 492 U.S. at 170–71, 109 S.Ct. 2854 (agency interpretation of term "subterfuge" due no deference because it was at odds with the ordinary and judicially established meaning of that term in context of ADEA); *Brown*, 513 U.S. at 117–122, 115 S.Ct. 552 (agency's interpretation of veterans' disability statute as requiring "fault" due no deference because statute contained no word or implication of such requirement); *John Hancock Mut. v. Harris Trust & Sav.*, 510 U.S. 86, 109, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993) ("By reading the words 'to the extent' to mean nothing more than 'if,' the Department has exceeded the scope of available ambiguity."). *See also Missouri Pac. R.R.*, 278 U.S. at 277–78, 49 S.Ct. 133 ("The language of [the] provision is so clear and its meaning so plain that no difficulty attends its construction in this case.... It is elementary that where no ambiguity exists there is no room for construction."); *Johns–Manville Corp.*, 855 F.2d at 1567 (unambiguous term "pending" accorded ordinary and established meaning).

█ In contrast to the above cases, the provision at issue here is *not* clear or unambiguous. This is not a case involving construction of a common term that is universally ascribed an ordinary definition, nor one involving technical jargon with a highly particularized meaning in the context of a regulatory area. Rather, the dispute over the so-called plain language in this case involves application of sometimes imprecise rules of syntax and grammar. The poor drafting and absence of punctuation in § 114.9(e) make that application all the more difficult. Indeed, the only matter that is certain with respect to the language of § 114.9(e) is that it is neither plain, nor clear. As a result, cases involving statutes or regulations that are manifestly clear are readily distinguishable from the case at bar.

Next, Specter '96 argues that, because the Commission published other materials that did clearly state that § 114.9(e) requires payment of charter fare for travel on commercial charter aircraft, the different language in § 114.9(e) must have a different meaning. (Specter '96 Resp. Mem. at 9–10). In support of this new argument, Specter '96 cites numerous cases in which courts found that the legislature's use of different language in different statutes indicated that the legislature intended a different meaning in the two areas. *See, e.g., Lindahl v. Office of Pers. Mgt.*, 470 U.S. 768, 779–80, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985); *Cameron v. Janssen Bros. Nurseries, Ltd.*, 7 F.3d 821, 826 (9th Cir.1993).

Again, however, these cases offer no assistance to Specter '96 on the plain language issue. Unlike in the cases Specter '96 cites, here the alternative sources are not separate, free-standing statutes or regulations. *See supra* note 7 (listing agency documents). Instead, they are, by definition, explanations of the language in § 114.9(e). Therefore, these sources do not provide a contrast with the language of § 114.9(e), but rather provide an explanation or clarification of the meaning of that very section. Regardless of the weight accorded these materials, they clearly do not buttress Specter '96's argument regarding plain language.

Finally, Specter '96 points to the structure of subsections (e)(1) and (e)(2) as evi-

dence that its interpretation of § 114.9(e) must prevail. Subsection (e)(1)—the section primarily at issue in this case—regulates transportation by aircraft. Subsection (e)(2) is largely parallel in purpose to (e)(1), except that it regulates transportation by other (i.e.non-aircraft) means. Specter '96 notes that (e)(2) does not include the phrase "in connection with a Federal election," whereas (e)(1) does. From that premise, Specter '96 argues that, if "in connection with a Federal election" modifies the verb "uses" in subsection (e)(1) (as the Commission suggests it does), then that same language should appear in subsection (e)(2) and modify the parallel verb "uses" in that subsection. Because the Commission chose to place the phrase only in subsection (e)(1), Specter '96 argues that this further contradicts the Commission's interpretation and confirms that "in connection with a Federal election" modifies "services" in subsection (e)(1).

We find this argument too tenuous to merit extended consideration. While there is potentially some lack of structural parallelism between (e)(1) and (e)(2) under the Commission's interpretation, that lack of parallelism cannot be elevated to "plain language" in favor of Specter '96's position. Moreover, such an argument could only have force with respect to a regulation drafted with great precision and clarity. *Cf. Tippins*, 37 F.3d at 93 (reliance on general canons of statutory construction inappropriate where statute was inartfully drafted and had imprecise language). As we have already illustrated, § 114.9(e) is the antithesis of clarity. Consequently, there is no basis for holding that so slender a reed as lack of parallel modifiers between subsections (e)(1) and (e)(2) is dispositive as to the meaning of § 114.9(e).

In sum, we find Specter '96's replies to the Commission's arguments unavailing.

However, in making that determination, we observe that the Commission's arguments themselves are not entirely satisfying. For instance, while there may in fact be no such thing as a license to offer commercial services that are for travel in connection with a federal election, there is nothing self-evidently absurd about such a license. Nor do we think it incumbent upon a candidate to be so familiar with applicable FAA regulations to question a clear and obvious reference to such a license. But therein lies the problem with Specter '96's entire argument—the language at issue is not clear or obvious. Given the language's ambiguity, we must reject Specter '96's argument that its interpretation of § 114.9(e) is compelled by the plain language of that section. We also note that Specter '96's interpretation of § 114.9(e), while not necessarily resulting an absurdity in theory, would result in an absurdity in fact by producing a regulation that requires a license that does not exist. In addition, that interpretation would create what appears to be a policy contradiction in the FEC's overall regulatory scheme. The FEC's interpretation, while perhaps not the most natural reading of the language at issue, is still reasonable in light of § 114.9(e)'s ambiguity and the counterintuitive result that would flow from Specter '96's interpretation. *See Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381.

### (2) *Prior FEC precedent*

Having determined that the plain language does not require us to reject the Commission's interpretation of § 114.9(e), we must examine whether the Commission's interpretation conflicts with prior FEC precedent. We find that it does not.

■ Agency interpretations of regulations that deviate, without explanation, from prior interpretations or explanations from the same agency are generally not

upheld by courts. *Bush–Quayle '92 Primary Comm. v. FEC*, 104 F.3d 448, 453 (D.C.Cir.1997) (citing *Interstate Quality Servs., Inc. v. RRB*, 83 F.3d 1463, 1465 (D.C.Cir.1996)). In other words, it is incumbent upon an agency that is departing from its prior interpretation of a given regulation to provide a "reasoned analysis that prior policies and standards are being deliberately changed, not casually ignored." *Id.; cf. FEC v. Democratic Sen. Campaign Comm.*, 454 U.S. 27, 37, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981) ("the thoroughness, validity, and consistency of an agency's reasoning are factors that bear upon the amount of deference to be given an agency ruling").

Here, Specter '96's argument primarily relies on the FEC's language within a Notice of Disposition of Petition for Rulemaking that addressed valuation of flights and § 114.9(e). The underlying Petition for Rulemaking was brought by the nonprofit organization Common Cause in July 1991. In that petition, Common Cause sought to have § 114.9(e) revised so that candidates, campaign committees, and political parties would be required to reimburse corporations at the charter rate for all types of flights on corporate aircraft. In its December 11, 1991 disposition of that petition, the FEC rejected the proposed revision. As part of the explanation for its decision, the FEC stated that:

> [T]he reimbursement rate set forth at 11 C.F.R. § 114.9(e) is *consistent with,* if not more stringent than the rates used by the House of Representatives' Committee on Standards of Official Conduct in investigating potential violations of the Rules of the House of Representatives. It is also *consistent with* the General Service Administration's regulations regarding disclosure of the value of permissible air travel by federal officials on corporate airplanes under the Ethics in Government Act.

*Campaign Travel on Corporate Aircraft,* 56 Fed.Reg. 64,566, 64,567 (FEC Dec. 11, 1991) (notice of disposition) (emphasis added). Specter '96 draws support from the above passage, specifically relying on the FEC's statement that the reimbursement rates of § 114 .9(e) are "consistent with" the analogous rates used by the General Service Administration ("GSA") and the House of Representatives. To understand Specter '96's position, we set out below the corresponding regulations of GSA and the House of Representatives. The GSA rate standard states:

> (i) Transportation. In the case of transportation on a chartered, corporate or other private aircraft, report the first-class rate that would have been charged by an air common carrier at the time the transportation was provided or, if common carrier transportation was unavailable between the two locations, report the cost of chartering a similar aircraft using a commercially available service.

41 C.F.R § 304–1.9(a)(4)(i). And the House of Representatives rate standard states: "With respect to gifts of transportation on private aircraft, the value is equal to the commercial air fare for the same flight." H.R.Rep. No. 95–1837, at 8 (1979).

Once again, paramount importance must attach to the actual language used by the FEC in prior precedent. In its 1991 Notice of Disposition, the FEC states that the "*reimbursement rate* [in § 114.9(e) ] is consistent with ... the *rates* used by the House of Representatives...." Likewise, with respect to the GSA, the FEC stated that "*It [i.e., the reimbursement rate of § 114.9(e) ]* is also consistent with General Service Administration's *regulations regarding disclosure of the value* of permissible air travel by federal officials on corporate airplanes...." 56 Fed.Reg. 64,566,

64,567 (emphasis added). As a close reading of the above passages shows, the FEC stated in 1991 that it was the "reimbursement rates" of § 114.9(e) that were "consistent with" the reimbursement rates of the House of Representatives and GSA.

The reimbursement rate within § 114.9(e) is stated in subsection (e)(1)(i) and (ii), which provide that corporations are to be reimbursed for air travel as follows:

> (i) In the case of travel to a city served by regularly scheduled commercial service, the first class air fare;
>
> (ii) In the case of travel to a city not served by a regularly scheduled commercial service, the usual charter rate.

Despite Specter '96's arguments to the contrary, a comparison of this reimbursement formula to those of the House of Representatives and GSA reveals that they are entirely consistent. In all cases, the applicable rate of reimbursement turns on the flight's destination and the availability of regular commercial service to that destination. The difference that Specter '96 apparently relies upon is not the reimbursement rate of the regulations, but rather the scope of their applicability. In terms of the scope of applicability, § 114.9(e) does differ with the other cited regulations—specifically, it excludes from its coverage those corporations "licensed to offer commercial services." Although that exclusionary language is problematic, we have already found that the FEC's determination that Koro falls within the exclusionary clause is based upon a reasonable interpretation of the regulation. *See supra* Part II.B(1). The fact that § 114.9(e) has a narrower application than the other regulations does not make the reimbursement rate of that section inconsistent with the others.[10] As a result, we find that the FEC's prior precedent regarding § 114.9(e) does not conflict with the position it has taken against Specter '96 and Koro.

Our conclusion is further supported by past FEC advisory opinions. On May 31, 1978, the FEC issued an advisory opinion in response to a question by then-U.S. Senator Robert Davis who asked about the applicability of § 114.9(e) to travel on aircraft owned by a non-profit corporation. *See* Advisory Op.1978–20: *Use of Airplane Owned by Non–Profit Corporation* [1976–1990 Transfer Binder] Fed. Election Camp. Fin. Guide (CCH) ¶ 5318 (May 31, 1978). In responding to Senator Davis's specific request, the FEC described § 114.9(e)'s meaning more generally, stating in part that "[s]ection 114.9 [provides] that the use of an airplane owned or leased by a corporation (other than one licensed to offer commercial services) for travel by or on behalf of a candidate in connection with a Federal election requires advance reimbursement." *Id.* The following year the FEC issued a related advisory opinion that interpreted § 114.9(e) in the same way. *See* Advisory Op.1979–52: *Use of Airplane Owned by Candidate's Corporation* [1976–1990 Transfer Binder] Fed.

---

10. Specter '96 also argues that 11 C.F.R. § 9034.7 confirms that § 114.9(e) applies, and § 100.7 does not. Section 9034.7 deals with allocation of travel expenditures for presidential primary candidates. Subsection (b)(8) of that section states "Travel on corporate airplanes and other corporate conveyances is governed by 11 CFR 114.9(e)." Specter '96 only cites this brief passage, neglecting to mention the preceding subsection (b)(7)(1), which specifically applies to charter commercial service. It is undisputed that Koro is an FAA-licensed charter air service business. Given that § 9034.7 distinguishes between flights on corporate aircraft and flights on charter commercial aircraft, this regulation actually supports, rather than undermines, the FEC's construction of § 114.9(e).

Election Camp. Fin. Guide (CCH) ¶ 5437 (Nov. 8, 1979) ("Part 114.9(e) of the Commission's regulations require a candidate, or the candidate's agent, who uses an airplane owned by a corporation (other than a licensed commercial air carrier) to reimburse the corporation...."). In both cases, the FEC's advisory opinions are in accord with its current interpretation of § 114.9(e) as it relates to this case.

Because we have determined that the FEC's interpretation of § 114 .9(e) neither conflicts with that regulation's plain language, nor violates prior FEC precedent, we will defer to the FEC's interpretation. *Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. 2381.

(3) *Due Process and the Rule of Lenity*

Specter '96 next argues that, even if we accept the FEC's reading of § 114.9(e), that interpretation cannot be applied to Specter '96 because doing so would violate the rule of lenity and principles of due process. Although Specter '96 blends these related arguments into one, we will address them individually.

■■ The rule of lenity requires that ambiguities in a criminal or punitive statute be resolved in favor of the defendants. *See, e.g., United States v. One 1973 Rolls Royce,* 43 F.3d 794, 819 (3d Cir.1994). This rule is based upon two underlying ideas: first, "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed," and second, "legislatures and not courts should define criminal activity." *Babbitt v. Sweet Home Chapter of Communities for Great Or.,* 515 U.S. 687, 704 n. 18, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (internal quotations omitted). Contrary to the FEC's suggestion, (FEC Reply Mem. at 22, n. 12), the rule has been applied in contexts beyond just criminal statutes. *See, e.g., United States v.*

*Thompson/Center Arms Co.,* 504 U.S. 505, 517–18, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992) (applying rule of lenity in civil context where ambiguous statute had some criminal applications). The rule of lenity, however, is invoked only when, "after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended." *United States v. Thayer,* 201 F.3d 214, 220 (3d Cir.1999) (quoting *Muscarello v. United States,* 524 U.S. 125, 138, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998)); *see also United States v. Hescorp, Heavy Equip. Sales Corp.,* 801 F.2d 70, 77 (2d Cir.1986) ("[The rule of lenity] is a doctrine of last resort, to be used only after the traditional means of interpreting authoritative texts have failed to dispel any ambiguities.").

■ In this case, there are numerous other interpretive aids, including principles of statutory construction, advisory opinions, and FEC campaign guides that clarify what the FEC intended in drafting § 114.9(e). *See United States v. Sanders,* 165 F.3d 248, 251–52 (3d Cir.1999) (rule of lenity only applies after resort to "language and structure, legislative history, and motivating policies of the statute"); *United States v. Iverson,* 162 F.3d 1015, 1025 (9th Cir.1998) (refusing to apply rule of lenity where "recognized interpretive aids" indicated intent). More significantly, we have already determined that the FEC's interpretation of § 114.9(e) is reasonable; the rule of lenity does not provide an interpretive back door through which to avoid that determination. *See United States v. Kanchanalak,* 192 F.3d 1037, 1050 n. 23 (D.C.Cir.1999) ("To argue, as defendants do, that the rule of lenity compels us to reject the FEC's otherwise reasonable interpretation of an ambiguous statutory provision is to ignore established principles of law."); *see also Babbitt,* 515 U.S. at 704 n. 18, 115 S.Ct. 2407 ("We have

never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement."). This reasoning is even stronger in the present case, which, unlike *Babbitt* or *Kanchanalak*, involves an agency interpretation of its own regulation, rather than an agency interpretation of a statute. *See Facchiano*, 987 F.2d at 213.

The concept of fair warning underlying the rule of lenity also underlies the due process issue. On this issue, Specter '96 relies primarily on *General Elec. Co. v. U.S. EPA*, 53 F.3d 1324 (D.C.Cir.1995). In *General Electric*, the District of Columbia Circuit held that the EPA did not provide General Electric with fair warning of its interpretation of a regulation governing PCB disposal and, therefore, could not hold the company liable for its conduct that ran afoul of that interpretation. *Id.* at 1333–34. In beginning its analysis, the Court of Appeals succinctly summarized the due process issues implicated:

> The due process clause prevents deference from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires. In the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability.

*Id.* at 1328 (internal quotations and citations omitted). *Cf. Martin v. OSHRC*, 499 U.S. 144, 158, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (observing that using enforcement or citation "as the initial means for announcing a particular interpretation may bear on the adequacy of notice to regulated parties."). The crucial inquiry therefore is whether "[i]f, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform." *General Elec.*, 53 F.3d at 1329 (citing *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir.1976)). *See also United States v. Chrysler Corp.*, 158 F.3d 1350, 1356 (D.C.Cir.1998) (finding insufficient notice of interpretation where agency's regulation was silent on question, Federal Register Notice was too general, and agency had taken conflicting positions in past); *Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 156–57 (D.C.Cir.1986) (finding insufficient notice where regulation unclear and only prior "warning" came from nonauthoritative third-party).

■ In response, the Commission argues that Specter '96's argument, by focusing exclusively on the language of the regulation, overlooks the Commission's other public statements on this issue. *See General Elec.*, 53 F.3d at 1329 (stating that notice can come from "regulations and *other public statements* issued by the agency.") (emphasis added); *PMD Produce Brokerage Corp. v. U.S. Dept. of Agriculture*, 234 F.3d 48, 53 (D.C.Cir.2000) ("Of course, the Secretary may utilize means other than the language of his Rules of Practice to give adequate notice of his interpretation."); *Sekula v. FDIC*, 39 F.3d 448, 455–57 (3d Cir.1994) (finding sufficient notice where interpretation of ambiguous regulation had been consistently applied, was consistent with regulation's general principles, and was disseminated to public in laymen's pamphlet). Specifically, the Commission points to several statements, including (1) the Explanation and Justification of § 114.9(e), which was published when § 114.9(e) was promulgated; (2) previously issued FEC Advisory Opinions 1978–20 and 1979–52; (3) the FEC's Campaign Guide for Congressional Candidates and Committees; and (4) the Financial

Control and Compliance Manual for Presidential Candidates Receiving Public Financing. *See supra.* Each of these materials explains § 114.9(e) in accordance with the Commission's present interpretation. Indeed, as we noted above, even Specter '96 admits that these materials state the standard "plainly and simply." (Specter '96 Reply Mem. at 10).

Given that it is undisputed that the above materials state the Commission's interpretation clearly and consistently, and that these materials were available to the public, we cannot accept Specter '96's argument that it lacked "fair warning" of the Commission's interpretation of § 114.9(e) despite the ambiguity of that section's actual language. *See, e.g., Sekula,* 39 F.3d at 457 ("there is no 'trap' when the agency's interpretation of a regulation is public and longstanding"). Unlike the cases it relies upon, Specter '96 does not point to any contradictory application of § 114.9(e), or a lack of timely, specific public statements, by the FEC. As a result, we must reject Specter '96's due process argument.

We have already determined that, because the FEC's interpretation does not violate the plain language of § 114.9(e) or prior FEC precedent, we must defer to the FEC's interpretation. Having now found that neither the rule of lenity, nor due process prevents application of the interpretation, we conclude that, per the FEC's interpretation, § 114.9(e) does not apply to the facts in this case.[11]

### C. *Exceeding the FECA*

■ In the second portion of its overall argument, Specter '96 argues that, if § 114.9(e) does not apply, and therefore Specter '96 is required to pay charter rates for the disputed flights, the FEC regulations impermissibly exceed the statutory authority of FECA. This argument requires us to apply the well-known standards of *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Chevron* controls judicial review of agency regulations to ensure that they accord with the statute from which they are derived. The *Chevron* analysis entails a two-step process. First, we look to see if Congress has spoken on the precise question in issue. If Congress has, and its intent is clear, our analysis is over. *Id.* at 842, 104 S.Ct. 2778. Regulations that are in accord with Congress's clear intent are upheld; regulations that conflict with Congress's clear intent are struck down. If, however, "the statute is silent or ambiguous with respect to the specific issue," then we

11. Koro and Specter '96 also add a new argument in their Reply Briefs, contending that even under § 100.7 Specter '96 should only have been required to pay first-class fares. Specifically, Specter '96 argues that the first-class fare it paid was not discounted from the "usual and normal" fare because Specter '96 only used Koro aircraft on a stand-by basis, and Koro charges all customers a first-class fare for stand-by flights. In support of this defense, Specter '96 cites to numerous FEC advisory opinions standing for the general rule that discounted goods and services do not constitute a contribution if similarly discounted goods and services were available to others. (*See* Specter '96 Reply Mem. at 2–6; Koro Reply Mem. at 11–13).

The FEC hotly contests whether Specter '96's Koro flights were, in fact, on a standby basis, and the only support provided by Specter '96 and Koro is a letter from one of Koro's owners to the FEC during the administrative proceedings below. Regardless of the admissibility of this evidence, or even the presence of additional evidence in support of this new argument, it is clear that whether Specter '96 was receiving stand-by service or normal reserved service is a disputed issue of fact. Because we are bound to draw all reasonable factual inferences in favor of the nonmovant, we cannot grant Koro and Specter '96's motion on the basis of this argument.

move to the second step—whether the agency's regulations are "based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778; *see also Abdulai v. Ashcroft,* 239 F.3d 542, 551–52 (3d Cir. 2001). When considering an agency's construction of an ambiguous statute, courts are required under *Chevron*'s second step to defer to the agency's interpretation so long as it is reasonable. *See, e.g., United States v. Haggar Apparel Co.,* 526 U.S. 380, 383, 119 S.Ct. 1392, 143 L.Ed.2d 480 (1999).

Both parties appear to agree that nothing in the statutory language or legislative history of FECA speaks directly to the precise issue in dispute. In terms of congressional intent, Specter '96 relies on the House of Representatives' rejection of a 1998 amendment as support for its position. That amendment, offered by Representative Tom Barrett (D–WI), would have required payment of charter fares for all travel on corporate or union aircraft. *See Statement of Rep. Tom Barrett Before House Comm. on Rules,* 1998 WL 8993706 (Mar. 25, 1998). Specter '96 argues that Congress's rejection of the Barrett amendment indicates its intent that FECA "does not require the payment of charter rates for private aircraft ." (Specter '96 Mem. at 34). The Commission responds that Congress's rejection of an amendment to require ·a charter rate on *all* corporate flights does not support the conclusion that Congress disagreed with the current regulatory distinctions between aircraft owned by corporations not engaged in the transportation business and aircraft owned by commercial charter service businesses. (FEC Resp.Mem. at 23). In addition, the FEC claims that subsequent legislative history cannot be relied upon for evidence of the intent of the Congress that enacted the statute years earlier. (*Id.*).

While we are skeptical about the amount of weight that can be properly given to a failed amendment that died in committee, we need not decide that question in this case. Even if we were to find clear intent embodied in Congress's rejection of the Barrett amendment, it does not follow that FECA does not require charter fares for flights on commercial charter service aircraft.

There are three relevant types of travel: (1) travel on aircraft provided by ordinary, publicly available, commercial service (e.g., USAirways or Delta); (2) travel on aircraft provided by corporations or labor organizations not in the air transportation business (e.g., IBM, Teamsters, or KAMA); and (3) travel on aircraft owned by entities who are in the specific business of providing charter air service (e.g., Koro). Representative Barrett explained that his amendment "would require candidates using corporate or union aircraft to reimburse the aircraft provider at charter rate." *Barrett Statement,* 1998 WL 8993706. He further explained that one of the principal rationales behind the amendment was to reverse the current policy that, in his view, "provide[d] executives and lobbyists for [the corporation that owned the aircraft] with special access to that candidate." *Id.* From these statements, it is clear that the Barrett amendment addressed only the second category of travel and would have made no change in the current law with respect to the third category of travel. Specter '96 blurs the distinction between the second and third type of travel by simply concluding that Congress, by rejecting a proposal to modify the reimbursement rate for travel on non-charter corporate aircraft, also rejected the standing FEC regulation requiring charter fares on commercial charter service flights. We find that conclusion unmerited and, accordingly, refuse to adopt

Specter '96's characterization of the congressional intent expressed.[12]

■ Because we have not found, in FECA's language or elsewhere, any clear congressional intent on the precise issue before us, we must determine whether the FEC's interpretation of the statute is reasonable. As we have discussed, FECA prohibits corporate contributions to political candidates. There is no dispute that the FEC has properly promulgated regulations that treat in-kind contributions among the types of contributions that are prohibited. Likewise, there is no dispute that FEC's construction of what constitutes an in-kind contribution—i.e., providing a good or service at a cost below the "usual and normal" rate—is reasonable. It follows in our view that there is nothing unreasonable about adopting separate regulations for corporations that are FAA-licensed charter services (and therefore have a "usual and normal" fare) and for corporations that are not in the business of providing air service (and therefore do not have an established "usual and normal" fare). *See supra* Part II.B(1) (discussing distinction). That distinction is at least a reasonable attempt to ensure that political candidates pay the same fares that a member of the public would pay if he or she contracted with a commercial charter service business, such as Koro. Specter '96's underlying objection to this regulatory state of affairs, namely that it is unfair for flights on large corporations' aircraft to be valued at a lower price than flights on a small commercial charter service's aircraft, is really a criticism of the current valuation formula used for non-charter corporate air travel—not a justification for allowing a lower rate for commercial charter air travel itself or a basis for finding the current regulatory distinction unreasonable. In sum, we find that the FEC's interpretation of FECA was reasonable, and the regulations promulgated do not exceed the scope of that Act.

\* \* \* \* \* \*

Based on the foregoing, we will deny Koro and Specter '96's Motion to Dismiss. We now turn to the FEC's Motion to Strike and the parties' cross-motions for summary judgment.

### III. *Motion to Strike*

In its Motion to Strike, the FEC argues that a large portion of the documents contained in Specter '96's Appendices is irrelevant or inadmissible. We have already denied the FEC's Motion with respect to those documents pertaining to Specter '96's Motion to Dismiss. *See supra* note 5. The remaining documents pertain to Specter '96's Motion for Partial Summary Judgment and include (1) FEC reports and newspaper articles regarding the FEC's treatment of 1996 presidential campaigns other than Specter '96; and (2) other FEC records, files, meeting transcripts, and rulemaking documents related to § 114.9(e). Based on our review of these various documents, we find the FEC's Motion to Strike meritless. There is little question that documents mentioned are relevant, at least for purposes of Spec-

---

**12.** Specter '96 also briefly argues that Congress's intent on this subject "is further confirmed by the Rules of the Senate and House, both of which require only first class fares for private travel." (Specter '96 Mem. at 35). The rules and interpretations Specter '96 cites, however, involve congressional intent as to the respective rules of the House of Representatives and Senate. There is nothing that necessarily links those expressions of intent to the entirely separate statutory and regulatory framework of FECA. Any linkage is further belied by the fact that the *specific* regulations at issue were not disapproved during any congressional review pursuant to 2 U.S.C. § 438(d). *See Democratic Sen. Campaign Com.*, 454 U.S. at 34, 102 S.Ct. 38.

ter '96's equal protection claim. Likewise, we think the FEC overstates the hearsay concerns these materials present at the summary judgment stage. As Specter '96 points out, courts have long-considered these types of materials when they have been offered for similar purposes. *See, e.g., Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 390–94, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). Because we find that the materials offered by Specter '96 are appropriately considered in the context of a summary judgment motion, we will deny the FEC's Motion to Strike in its entirety.

## IV. *Motions for Summary Judgment*

### A. *Legal Standard*

When deciding a motion for summary judgment under Fed.R.Civ.P. 56(c), a court must determine "whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgement as a matter of law." *Medical Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir.1999) (internal citation omitted). In making this determination, courts should view the facts, and reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). For its part, the non-moving party must, through affidavits, admissions, depositions, or other evidence, demonstrate that a genuine issue exists for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In making its showing, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *id.* at 586, 106 S.Ct. 1348, and must produce more than a "mere scintilla of evidence in its favor" to withstand summary judgement. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986). If the non-moving party fails to create "sufficient disagreement to require submission [of the evidence] to a jury," the moving party is entitled to judgement as a matter of law. *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. 2505.

### B. *Specter '96's Motion for Summary Judgment*

Specter '96 argues that the FEC violated its rights under the Fifth Amendment's Due Process Clause by forcing it to pay charter fares for corporate flights while forcing every other presidential campaign to pay only first-class fares for similar flights. In addition, Specter '96 submits that the FEC's rationale for this unequal treatment—i.e., the regulatory distinction between flights on aircraft owned by charter services and flights on aircraft owned by corporations that are not in the transportation business—cannot withstand scrutiny. The FEC responds that it administered its regulations uniformly and that the different treatment of Specter '96 compared to the other campaigns owes entirely to Specter '96 choosing to fly on commercial charter flights, instead of non-commercial corporate flights as the other candidates did. Further, the FEC maintains that the regulatory distinction between these types of travel passes the appropriate level of scrutiny.

First, to the extent that Specter '96 argues that the FEC enforced its code in a unconstitutional manner by allowing other campaigns to pay only first-class fares on corporate aircraft while requiring Specter '96 to pay charter fares for similar flights, we reject this claim. As we have discussed at length, based upon the FEC's reasonable interpretation of its regulations, these two types of flights are not the same. Specifically, the distinction exists between flights on aircraft owned by cor-

porations that provide commercial charter service and flights owned by corporations that do not engage in the air transportation business. Specter '96's apparent contention that, under the applicable regulations, there is no difference between flights on aircraft owned by a commercial carrier like Koro and flights on aircraft owned by a corporation not in the air transportation business like Phillip Morris or IBM is simply wrong.

■ Next, we must determine whether the regulatory distinction referred to passes constitutional muster. The threshold question is what level of scrutiny should we employ in making that determination. Specter '96 argues that some level of heightened scrutiny applies, while FEC claims otherwise.

■ It is beyond question that "[s]pending for political ends and contributing to political candidates both fall within the First Amendment's protection of speech and political association." *FEC v. Colorado Republican Fed. Campaign Comm.,* 531 U.S. 923, 121 S.Ct. 2351, 2358, 150 L.Ed.2d 461 (2001) ("*Colorado II*"). However, as the Supreme Court also recently reconfirmed, "ever since we first reviewed the 1971 [FECA], we have understood that limits on political expenditures deserve closer scrutiny than restrictions on political contributions." *Id.; see also Shrink,* 528 U.S. at 387, 120 S.Ct. 897 ("We have consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending.") (quoting *FEC v. Massachusetts Citizens for Life, Inc.,*

479 U.S. 238, 259–60, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986)). Specter '96 claims that, like other restrictions on political speech, "[t]he financial restrictions the FEC imposes on [Specter '96]'s ability to engage in campaign travel throughout the nation must also survive exacting scrutiny." (Specter '96 Mot.Mem. at 56). Specter '96 further reasons that "indispensable instruments of effective political speech" such as mass-mailings and media operations, *see Buckley v. Valeo,* 424 U.S. 1, 19, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), are "no different than the need for Presidential candidates ... to travel throughout the country to meet with supporters and to get out their message." (Specter '96 Mot.Mem. at 56). We find this argument unpersuasive.

The FEC's regulatory distinction does not restrict Specter '96 from spending to travel across the country or to engage in political speech. The restrictions on political communication in *Buckley* placed a ceiling on the expenditures a candidate could make. In contrast, the regulation at issue here in no way limits Specter '96 or any other campaign's expenditures.[13] More simply, the entire dispute in this case centers on the regulation of in-kind *contributions,* as opposed to some type of *expenditure.* The primary regulation at issue, 11 C.F.R. § 114.9, sets forth rules for campaigns regarding their use of, and payment for, corporate or union facilities or transportation. By following those rules, candidates can avoid receiving a prohibited in-kind contribution by virtue of their use of corporate facilities or transportation. *See* 11 C.F.R. § 114.9; *see also*

13. Regarding the restriction at issue in that case, the *Buckley* Court remarked that "[b]eing free to engage in unlimited political expression subject to a ceiling on expenditures is like being free to drive an automobile as far and as often as one desires on a single tank of gas." *Buckley,* 424 U.S. at 18, n. 18, 96 S.Ct.

at 634 n. 18. Here, the FEC has not limited Specter '96 to "a single tank of gas" at all. Rather, to complete the analogy, the FEC has simply set a certain price, applicable to all candidates, who choose to use a type of gas that does not have an otherwise established price.

2 U.S.C. § 441(b)(a) (prohibiting corporate *contributions* ); 2 U.S.C. § 431(8) (defining *"contribution"*); 11 C.F.R. § 100.7 (defining "anything of value" as including "all in-kind *contributions* "). Because the restrictions at issue in this case are properly viewed as restrictions on contributions, we will not apply the more exacting scrutiny appropriate for review of restrictions on expenditures. *See Colorado II,* 121 S.Ct. 2351, 2358.[14]

■ Specter '96 next argues that, regardless of what standard of scrutiny we use, the FEC has failed to justify the distinction between flights on aircraft owned by commercial carriers and flights on aircraft owned by corporations not engaged in the air transportation business. Again, we disagree.

The essential issue before us is whether there is sufficient basis for the FEC to distinguish between the value of a charter service flight and the value of a non-charter, corporate flight. Starting from the beginning, there is quite obviously a reasonable basis for requiring a political candidate to pay a charter fare for a flight aboard a charter service flight—a charter fare is the fare that a member of the public would be required to pay for such a flight. Allowing a political candidate to pay a lesser charge than other persons (and thereby permitting an in-kind contribution) would undermine the entire purpose of FECA.

Next, we turn to flights on aircraft owned by a corporation not engaged in the transportation business. Unlike charter flights, these flights present a valuation problem because there is no established, normal charge for them; by definition, a member of the public does not have the ability to pay for a flight aboard, for example, Microsoft's private corporate jet. To address this situation, the FEC, with Congress's acquiescence, chose to value these types of flights at a first-class rate. That valuation may well have been ill-chosen or unwise, and the FEC and Congress could have quite plausibly assigned a different value to these flights. But it is not this Court's role to substitute our judgment for the judgment of Congress and the FEC with respect to the proper value of corporate flights. Because the flights at issue did not have an established usual and normal fare, some reasonable value had to be assigned to them, and there is nothing unreasonable about valuing these flights at a first-class fare. Indeed, as Specter '96 itself points out, both the FEC and Congress had the specific opportunity to change that valuation to a charter fare but instead chose to keep the first-class rate. *See Campaign Travel on Corporate Aircraft,* 56 Fed.Reg. 64,566, 64,567 (FEC

---

**14.** In reaching this decision, we recognize that the precise level of scrutiny appropriate for a regulation of a contribution is somewhat muddled. We believe, however, that it is abundantly clear that this is not the type of case in which the limitation involves "significant interference with associational rights" that would require the FEC to show that the regulation was "closely drawn to match a sufficiently important issue." *Shrink,* 528 U.S. at 387, 120 S.Ct. 897 (internal citations omitted); *see also Mariani v. United States,* 212 F.3d 761, 770–70 (3d Cir.2000) (applying "closely drawn" standard to challenge on bans on corporate contributions). Indeed, the limitation at issue here—to the extent there is a limitation at all—is a limitation on Koro's ability to give a corporate in-kind donation. On this issue, we note that Koro has not raised a equal protection argument and, in any event, we are bound by Third Circuit and Supreme Court precedent upholding the ban on corporate contributions, *see, e.g., Mariani* at 212 F.3d at 771–773. For its part, Specter '96 has completely failed to demonstrate how this facially neutral regulation affected Specter '96's associational rights in such a way that would merit more exacting scrutiny.

Dec. 11, 1991) (notice of disposition) (rejecting proposed rule to require reimbursement at charter rate for flights aboard corporate or union-owned aircraft); *Representative Barrett July 20, 1998 Press Release* at 2414A (noting Congress's rejection of amendment that would have required reimbursement at charter rate for flights aboard corporate or union-owned aircraft).[15]

Finally, as a result of the above, we are left with a distinction in the regulatory apparatus between the valuation of flights on·charter service aircraft and flights on ordinary, private corporate aircraft. Specter '96 seizes upon this distinction, arguing that it cannot survive any level of equal protection scrutiny. Although it is clear that a distinction exists, it is equally clear that every regulatory distinction does not equate to an equal protection violation. *See, e.g., FCC v. Beach Comm., Inc.,* 508 U.S. 307, 315–16, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (recognizing that regulatory requirements will often involve difficult line-drawing and that "the fact that the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration"). Quite simply, the flights in question are different, as we have now observed several times. Likewise, while other campaigns paid a different rate, those campaigns did so because they traveled aboard different types of flights than did Specter '96. Specter '96's chief claim appears to be that the commercial charter flights it took were, in sum and substance, the same as the non-commercial, corporate flights the other campaigns took. While Specter '96 may believe that to be the case, the FEC and Congress have taken the different view that the value of non-charter, corpo-

rate flights most closely approximates the value of a first-class flight. Given that these flights have no established or otherwise ascertainable value in an open market, and that Congress and the FEC have unmistakably rejected Specter '96's position in favor of their own, we conclude that the distinction embodied in the regulations is reasonable. The differences in effect in this case are not due to any disparate treatment, but are the result of the free choices of Specter '96. Similarly, there is no evidence of any kind that application of this neutral distinction disparately impacts any particular campaign or candidate. Specter '96's claims, for all of their forcefulness, fall well short of constitutional dimension.

## C. *The FEC's Motion for Partial Summary Judgment*

The FEC also cross-moves for partial summary judgment with respect to Specter '96 receiving, and Koro giving, an in-kind contribution in violation of 2 U.S.C. § 441b(a). Because we believe that there are several genuine issues of material fact still in dispute, we will deny the FEC's Motion.

The FEC argues that Specter '96 and Koro have conceded that Specter '96 only paid first-class fares for flights for which Koro normally charged a charter rate. While Specter '96 has admitted that only first-class fares were paid for the flights in question, that is not the end of the matter. Both Specter '96 and Koro maintain that the true nature of the flights was "standby" and that the normal price charged for such flights was only a first-class fare. In addition, a dispute exists over the actual ownership of the aircraft that Koro used for several of Specter '96's flights. The

---

**15.** We also note that, even if we agreed with Specter '96 that a charter rate must be used to value corporate flights on non-charter service aircraft, that determination would not

advance Specter '96's ultimate argument that it should be permitted to pay first-class fares on charter service aircraft.

parties also continue to disagree on the exact number of flights that are subject of this action and the documentation supporting that determination. The resolution of any of these issues could alter the ultimate finding in this case. As a result, we conclude that summary judgment is inappropriate at this time. Accordingly, we will deny the FEC's Motion.

## CONCLUSION

For the foregoing reasons, we will deny all of the motions currently before the Court. An appropriate Order follows.

## *ORDER*

AND NOW, this 26th day of July, 2001, upon consideration of Arlen Specter '96 and Paul Diamond's Motion to Dismiss (Document No. 13); Koro Aviation's Motion to Dismiss (Document No. 11); the Federal Election Commission's Motion to Strike (Document No. 19); and the Federal Election Commission's Motion for Summary Judgment (Document No. 17), and the Responses thereto, it is hereby ORDERED that ALL of the Motions are DENIED.